### LEACH v. COLEMAN et al.
#### No. 9494.

Court of Civil Appeals of Texas. Austin.

May 2, 1945.

Rehearing Denied May 30, 1945.

Raymond Furr, of Austin, for appellant.

W. T. Williams, City Atty., and Joe B. Roberts, Asst. City Atty., both of Austin (J. M. Patterson, of Austin, of counsel), for appellees.

BLAIR, Justice.

Appellant, C. R. Leach, sued appellees, the City of Austin and its City Health Officer, Dr. J. M. Coleman, to enjoin them from enforcing an ordinance regulating the sale of milk and milk products, and from enforcing the orders of the City Health Officer degrading the milk of appellant and revoking his permit to sell milk and milk products in Austin.

Appellant alleged and here contends that the ordinance is unconstitutional and invalid because:

1. It fails to provide for any notice or hearing to revoke a permit to sell milk and milk products, in violation of Sec. 19 of Art. 1 of the Texas Constitution, Vernon's Ann.St., relating to due course of law.

2. It attempts to vest either the City of Austin or its City Health Officer with judicial power to adjudicate the standards and conditions under which milk or milk products may be sold in violation of Sec. 1

of Art. 5 of the Texas Constitution, vesting judicial power exclusively in the courts, and fails to provide adequate standards for grading same; and authorizes the revocation of a permit to sell milk upon grounds not within the police power of the City of Austin.

3. It conflicts with the provisions of Art. 165—3, setting up different standards and specifications for grade A milk, and authorizing regulation only of the sale of milk and milk products directly to the consumers; and conflicts with Sec. 5 of Art. 1146, and Art. 1165, by providing for a fine of more than one hundred dollars for violation of the provisions of the ordinance.

We are of the view that neither of the foregoing contentions is tenable. As a preface to a discussion of them a preliminary statement of the facts and of the applicable provisions of the Charter of the City of Austin and of the ordinance and statutory law involved will be here made.

The facts giving rise to the litigation are not in material dispute. Beginning in March, 1944, and from time to time during the intervening months to November 20, 1944, the inspectors of both the City of Austin and the State Health Departments made numerous tests of the milk and milk products being sold by appellant in Austin, and Dr. Coleman, either ·in his capacity as City Health Officer or as County Health Officer of Travis County notified appellant by registered letter of the results of the tests, which showed that the average bacterial plate count exceeded the 50,000 bacteria per cubic centimeter prescribed by the standards and specifications fixed by the State Health Officer and by the ordinance in question for grade A raw milk. The letters warned appellant of these conditions, tendered the services of the City Health Department to remedy them, informing appellant that the last four samples for tests showed an average bacterial plate count of 190,000, and that the last on October 2, 1944, showed a count of 8,300,000 bacteria per cubic centimeter. On that date the City Health Officer notified appellant that his milk had been temporarily degraded from A to B grade, effective October 6, 1944. During the month of October, 1944, four complaints were filed against appellant, three in the corporation court and one in the justice of the peace court, charging him with misbranding or mislabeling his milk as grade A; and in each case the jury found him guil-

ty. Thereafter, on November 10, 1944, the State Health Officer revoked appellant's permit to grade and label his milk to be sold in Austin; and on November 20, 1944, the City Health Officer notified appellant that his permit to grade and label his milk for sale in Austin was revoked, effective on November 25, 1944, because of violations of the grading and labeling provisions of the ordinance, and because of violations of certain sanitary provisions of the ordinance at the dairy farm. or plant of appellant relating to the production of grade A milk. The orders degrading the milk and revoking the permit of appellant were made without notice or hearing at which appellant was confronted with the witnesses who made the tests of his milk, or the inspector who inspected and found his dairy farm or plant to be unsanitary, or as not meeting the sanitary standards required to produce grade A milk. No appeal was taken by appellant from either of the orders here complained of either to the City Council or to the State Health Officer, as provided by the ordinance. On November 27, 1944, appellant filed this proceeding to declare the ordinance and the foregoing orders void, and obtained a temporary injunction restraining the City of Austin and its Health Officer from enforcing the ordinance and the orders degrading his milk and revoking his permit to grade and label his milk to be sold in Austin; which injunction was dissolved on final hearing and all relief sought by appellant denied.

The City of Austin is a Home Rule City, having adopted its charter under authority of Sec. 5 of Art. 11 of the Texas Constitution, and what is now Art. 1175, R.S. 1925. The charter grants to the governing body power to make and enforce rules and regulations to promote and protect the health of the people, to suppress disease, and to "determine the mode of inspecting milk" within the city and its police jurisdiction. This charter power was ratified by the general validating acts of 1925 and 1929, Art. 1174a, Vernon's Ann.Civ.St. Art. 165—3, Acts 1937, Vernon's Ann.Civ. St., is a general statute and authorizes the regulation of the production and sale of milk and milk products in the interest of the public health by the State Health Officer; requires him to promulgate rules, regulations, standards, and specifications therefor; defines various kinds of milk and milk products; provides for permits for use of labels in advertising or labeling milk for sale to the public; and au-

thorizes city and county health officers to issue such permits to persons who comply with the specifications and regulations promulgated by the State Health Officer as to grading and labeling of milk and milk products before sale thereof; and authorizes the State Health Officer to revoke or regrade permits issued by such local health officers whenever the milk being sold is found not to comply with the standards and specifications fixed by the State Health Officer. The statute also provides that:

"Any city adopting any specifications and regulations for any grade of milk shall be governed by the specifications and regulations promulgated by the State Health Officer, as herein authorized." § 2.

And further provides that:

"The governing body of any city in the State of Texas may make mandatory, the grading and labeling of milk and milk products sold or offered for sale under the United States Standard Milk Ordinance within their respective jurisdictions as defined herein according to Definition (P) Section 1 for grades 'A', 'B', 'C', and 'D' Raw milk or Milk Products, and Definition (Q) for grades 'A', 'B', and 'C' pasteurized milk or milk products by adopting an ordinance to that effect and by providing the necessary facilities for determining the grades and for the enforcement of this Act. Provided, however, the provisions of this Section shall apply only to milk or milk products, sold or offered for sale by any person, partnership, or corporation directly to the consumer of such milk or milk products." § 7.

Act 165—3 became effective in April, 1937. On July 1, 1937, the governing body of the City of Austin, acting under its foregoing charter power and the authority given by Art. 165—3, passed the comprehensive though somewhat involved ordinance in question, regulating the grading and labeling of milk and milk products to be sold within the police jurisdiction of Austin. The ordinance was twice amended in 1942, apparently to comply with the rules, regulations, standards, and specifications promulgated by the State Health Officer on March 1, 1942, because the ordinance adopted those of them here involved without change with respect to grading and labeling of milk and milk products to be sold in Austin, and the sanitary rules required for grading and labeling same in their respective classifications. Sec. 3 of said State Health Officer's rules and regulations further provides:

"Permits—It shall be unlawful for any person to bring into or receive into a city which has adopted these grade specifications, or its police jurisdiction, for sale, or to sell, or offer for sale therein, or to have in storage where milk or milk products are sold or served, any milk or milk product defined in this promulgation, who does not possess a permit from the health officer of the city.

"Only a person who complies with these requirements shall be entitled to receive and retain such a permit.

"Such a permit may be suspended by the health officer, or revoked after an opportunity for hearing by the health officer, upon the violation by the holder of any of these specifications and requirements."

The ordinance provides that the City Health Officer shall enforce the provisions thereof, including the issuance of permits to label milk and milk products to be sold in Austin, and provides that:

"Such a permit may be revoked by the City Health Officer upon the violation by the holder of any of the terms of this Ordinance or in any emergency when in the judgment of the Health Officer the milk or milk product in question has become a public health menace: Provided that the holder of said permit shall, after complying with such revocation, have the right of appeal to the City Council of the City of Austin, as herein provided. In the event the Health Officer refuses a permit to an applicant, or a permit is suspended or revoked by said Officer, the applicant whose permit is refused, or the holder of a permit which has been revoked or suspended shall have the right of appeal to the City Council by filing an appeal in writing with said City Council within five (5) days from the date of refusal to grant said permit, or the revocation or suspension of said permit, by the City Health Officer. The City Council, after a hearing at a time to be set by said Council, shall either affirm, modify, or otherwise change the action of the City Health Officer, and may in the event the action of the Health Officer is not affirmed, give such instructions as it may deem necessary to the Health Officer, who shall carry out such instructions as given by the City Council: Provided, that pending action on the appeal herein, a permit which has been suspended or revoked shall be considered as suspended or re-

voked, and the holder shall not have any right thereunder, unless the action of the City Health Officer is subsequently changed by the City Council. If a permit is revoked because of the unauthorized use of the grade 'A' label or for the violation of Section 2 of this Ordinance, such revocation shall not be included in this appeal, but may be submitted to the State Health Officer or his representative."

Home rule cities may under charter power regulate by ordinance the grading and labeling of milk and milk products sold within their police jurisdiction in the interest of the public health. They cannot go beyond the limits of the authority given by Art. 165—3, because of the rule that the governing authority of any city is prohibited by the Constitution and statutes of this State from entering legislative fields that have already been entered by the legislature itself. Prescott v. City of Borger, Tex.Civ.App., 158 S.W.2d 578, error refused.

The first question: Is the ordinance in question void because it fails to provide or require a notice and hearing by the City Health Officer to revoke a permit issued by him to grade and label milk and milk products to be sold in Austin, as being in violation of Sec. 19 of Art. 1 of the Texas Constitution, relating to due course or process of law? We answer the question in the negative.

Sec. 3 of Art. 165—3 provides that those desiring to use labels representing, publishing or advertising any milk or milk products for sale as grade A, B, C or D in any city or town shall make application to the City Health Officer thereof for a permit to do so; that such health officer shall determine the grade under the regulations and specifications promulgated by the State Health Officer, and accordingly issue labeling permits, report them and any revocation thereof to the State Health Officer, except in instances specified by him. The State Health Officer or his representatives are also authorized to revoke or re-grade labeling "permits issued by any local health officials, when upon examination he or his representative shall find that such permit for the use of any grade label does not conform to the specifications or requirements promulgated by him in conformity to this Act." Likewise, the ordinance in question authorizes the City Health Officer to issue labeling permits in conformity with the standards and specifications prescribed, which are in all instances material here, identical with those promulgated by the State Health Officer; and to revoke such permits for violation of the labeling provisions of the ordinance.

Neither Art. 165—3 nor the ordinance in question requires notice and hearing by a city health officer to revoke a permit to use labels representing, publishing or advertising milk and milk products for sale as grade A, B, C or D in any city or town. Nor does Art. 165—3 require notice and hearing by the State Health Officer and his representatives to "revoke or re-grade permits issued by any local health officials"; but such power is given "when upon examination he or his representative shall find that such permit for the use of any grade label does not conform to the specifications or requirements promulgated by him in conformity to this Act."

The evidence shows that milk and milk products are the sources of fevers, diseases and other ills that menace the public health when produced from diseased cattle, or handled by diseased persons, or produced and handled under unsanitary conditions existing at dairy farms or plants. Such is also a matter of common knowledge. Therefore the business of operating a dairy, or producing and handling milk for sale, particularly in cities and towns or populated centers, is one which affects the public health and is under the exercise of the police power, subject to regulation and control in all its aspects by both the state and the municipal governments. Each such government may authorize an administrative official to grant a license or permit in conformity with standards, rules and regulations prescribed by statute or ordinance to sell, or to grade and label milk or milk products, to be sold the public, and each may vest such official with power to revoke such a license or permit for causes enumerated or under definite rules or conditions prescribed by the statute or ordinance for guidance of the revoking official. Such revocation may be made without previous notice or hearing, unless otherwise provided by the statute or ordinance. These rules have been adopted by the great weight of authority, including Texas decisions. 38 Am.Jur. 62, and cases cited in footnote 11. The statute and ordinance here involved are silent with respect to notice and hearing by the city health officer to revoke a permit to sell milk and milk products, or to grade and

label milk, upon his determination of the facts or conditions prescribed in the statute or ordinance authorizing the revocation. The statute also provides that the State Health Officer may revoke such a permit "when upon examination he or his representatives shall find that such permit for the use of any grade label does not conform to the specifications or requirements promulgated by him in conformity to this Act." And the weight of authority hold, as stated in 33 Am.Jur. 383, that:

"Where the enactment is silent as to notice or hearing on revocation, the necessity of whether it should be given must be determined from the character of the case and the local practice. Where there is reason to believe that a business is a nuisance, a menace to public health, or detrimental to peace or morals, a license of such business may be revoked even before the expiration of the time for which it has been granted, and without notice to the licensee, provided only that statutory authority and conditions be pursued."

In Mahaney v. City of Cisco, Tex.Civ. App., 248 S.W. 420, 423, writ dismissed, the court quoted with approval the rule stated in 19 R.C.L. 975, § 272, as follows:

"When an occupation is of such a character that a municipal corporation under a general grant of the police power is justified in regulating it in the interests of the public health, morals, safety, or welfare, and, as an incident to such regulation, in requiring a license to be taken out by all who seek to engage therein, the power of the municipality to revoke such a license whenever in the opinion of the municipal authorities the public interests require such action is inherent, and may be exercised without previous notice to the holder of the license and without affording him an opportunity to be heard. In such case the licensee has no redress, provided the action of the municipal authorities was not arbitrary, tyrannical, unreasonable, or based upon false information."

The Mahaney case also holds that summary action may be taken by a municipal government to revoke such a license or permit under the rule quoted from 25 Cyc. 626, which reads:

"But one who accepts a license from a municipality on condition that it may be revoked at discretion, when the municipality has statutory power to impose such condition, thereby assents to the terms imposed, and is estopped to question the right

to revoke, and such estoppel applies even though no notice of intention to revoke be given to him."

The rule applies in the instant case. The ordinance involved provides that any person who complies with its requirements "shall be entitled to receive and retain" a permit to sell milk or milk products of certain grades issued by the City Health Officer, who may also revoke such permit upon ascertaining that the holder has violated "any of the terms of the ordinance, or in any emergency when, in the judgment of the health officer the milk or milk products in question has become a public health menace." The authority so given the health officer to summarily revoke such a permit became a part of it, which was accepted by appellant when he accepted the permit under the terms so imposed. The undisputed facts show that appellant violated the terms of the ordinance with respect to his permit to sell grade A milk, for which he was convicted in four cases, and of which he was notified by registered letters on numerous occasions by the City Health Officer.

The power to summarily revoke a license or permit in the interest of the public health, morals, safety or welfare has been approved by many decisions in this state. State v. DeSilva, 105 Tex. 95, 100, 145 S.W. 330, 333; Baldacchi v. Goodlet, Tex.Civ.App., 145 S.W. 325, writ refused; Turner v. Bennett, Tex.Civ.App., 108 S.W. 2d 967; Hanzal v. City of San Antonio, Tex.Civ.App., 221 S.W. 237; City of San Antonio v. Zogheib, 129 Tex. 141, 101 S. W.2d 539; Zucht v. King, Tex.Civ.App., 225 S.W. 267, writ refused 257 U.S. 650, 42 S.Ct. 53, 66 L.Ed. 416. A case directly in point from another jurisdiction is State ex rel. Nowotny v. City of Milwaukee, 140 Wis. 38, 121 N.W. 658, 659, 133 Am.St. Rep. 1060, from which we approve the following applicable quotation:

"A health officer who is expected to accomplish any results must necessarily possess large powers and be endowed with the right to take summary action, which at times must trench closely upon despotic rule. The public health cannot wait upon the slow processes of a legislative body, or the leisurely deliberation of a court. Executive boards or officers, who can deal at once with the emergency under general principles laid down by the lawmaking body, must exist if the public health is to be preserved in great cities. Lowe v.

226

Conroy, 120 Wis. 151, 97 N.W. 942, 66 L.R. A. 907, 102 Am.St.Rep. 983 [1 Ann.Cas. 341]. It is well said in People [ex rel. Lieberman] v. Vandecarr, 175 N.Y. 440, 67 N.E. 913, 108 Am.St.Rep. 781: 'The vesting of powers more or less arbitrary in various officials and boards is necessary if the work of prevention and regulation is to ward off fevers, pestilence, and the many other ills that constantly menace great centers of population.' [The ordinance (instant Milwaukee case) read]: 'which license may at any time be revoked by the commissioner of health for violation of the provisions hereof, or for any good and sufficient cause.' * * * The requiring of licenses and the reserving of the power to revoke such licenses * * * is well recognized as one of the most effective means of regulating and restraining a business that has yet been discovered, but the power of revocation would amount to little if it could not be vested in an executive officer or board with power to act quickly. * * * The importance of reserving in some executive official the power to revoke can hardly be overestimated. Prosecutions to recover fines and penalties may drag their weary lengths along for weeks and months, and even then prove ineffective; but the revocation of the license remedies the evil and avoids the danger of the spreading of disease at once. It is regulation in the most effective sense. We have no hesitation in holding that, when the city was given the power to license, restrain, and regulate the sale of milk, it also took power to revoke licenses, and that it might vest such power in the health commissioner, with the right to exercise the same summarily and even without notice."

The case of Francisco v. Board of Dental Examiners, Tex.Civ.App., 149 S.W.2d 619, writ refused, is not in point here. That case involved the Board's act of revoking the license of a dentist on charges of moral turpitude, because of an alleged conviction in another state of forgery. A professional license was there involved and the question as to what amounts to a conviction which will justify the revocation of such a license was treated or decided. The question of the public health, morals, or welfare was not involved.

The second contention of appellant that the ordinance is unconstitutional or invalid is based upon three general points, which are in substance:

(a) That the ordinance attempts to vest either the City of Austin or its health officer with judicial power to adjudicate the standards or conditions under which milk or milk products may be produced for sale in Austin.

(b) That the ordinance fails to provide adequate standards for grading milk or milk products.

(c) That the ordinance authorizes denial of a permit to sell milk or milk products and the revocation of the permit upon grounds not within the police power of the City of Austin.

■ Other than the foregoing general points, no specific provision of the ordinance is cited as showing that the City or its health officer is vested with judicial power to determine the grades, standards, and wholesomeness of milk or milk products produced for sale within the City of Austin. We have already fully analyzed the terms of Art. 165—3 as providing for the regulation of milk grading, labeling and pasteurization, defining milk and milk products, and authorizing the State Health Officer to promulgate regulations and specifications therefor, and for the issuance by city health officers of permits authorizing the holders to grade and label milk or milk products offered for or to be sold in any city or town; and as providing that any city or town may by ordinance regulate and control the grading and labeling of same for sale therein. Both the statute and the ordinance provide for testing periods to determine whether an applicant for a permit has complied with the grading and labeling requirements prescribed by the State Health Officer before he is entitled to receive a permit from the City Health Officer, and permittee is required to maintain such standards and specifications to retain his permit. The State Health Officer promulgated comprehensive rules, regulations, standards, and specifications for testing, grading, and labeling of milk and milk products, which specifically defined milk and milk products and the various grades thereof, and which were incorporated in the ordinance without material change. The State Health Officer also promulgated regulations and specifications prescribing the sanitary conditions to be maintained at dairy farms or milk plants for the production of grade A milk to be sold in cities or towns, which were likewise incorporated in the ordinance. Thus the ordinance enu-

merated the standards, specifications, and requirements for the various grades of milk and milk products and the sanitary conditions required for its production. Appellant applied for and obtained his permit to sell grade A milk and milk products in Austin under the specific tests, standards, specifications, and regulations specifically prescribed by the ordinance, which ordinance authorized the City Health Officer to revoke the permit for any violation of the terms or provisions thereof. His permit was revoked by the City Health Officer for violation of the provisions relating to grading and labeling his milk and for failure to maintain the sanitary conditions at his dairy for the production of grade A raw milk. The ordinance, not the City or its health officer, specifically prescribed the tests, standards, and specifications for grade A milk. It was the duty of the health officer to enforce the ordinance, and he revoked the permit of appellant under the authority given by the ordinance to determine the facts or conditions as to the violations of the ordinance.

■ Our foregoing findings and conclusions overrule point (b) that the ordinance fails to provide adequate standards for grading milk or milk products.

Point (c), that the ordinance vests the City Health Officer with authority to refuse or deny a permit "on grounds which may not come within the police powers of said municipality," is not supported by any statement showing how the point arose, nor is any reference made to any provision of the ordinance which may not come within the police power of the City of Austin. The point is therefore overruled.

■ Nor is the contention of appellant tenable that the ordinance is unconstitutional or invalid because certain of its provisions conflict with statutory law on the same subject, or attempt to enter a field already occupied by legislative enactments.

One contention made is that the standards or specifications promulgated by the State Health Officer under authority of Art. 165—3 for grade A raw milk conflict with or differ from those prescribed by the ordinance. The State Health Officer's standards and specifications for grade A raw milk, among others, provide:

"Grade A raw milk is raw milk the average bacterial plate count of which as determined under sections 1(S) and 6 of this ordinance does not exceed 50,000 per cubic centimeter, or the average direct microscopic count of which does not exceed 50,000 per cubic centimeter if clumps are counted or 200,000 per cubic centimeter if individual organisms are counted, or the average reduction time of which is not less than 8 hours."

The ordinance provides, among other standards for grade A milk, as follows:

"Grade A raw milk is milk the average bacterial plate count of which, as determined under Section 1(R) and 6 of this Ordinance, does not exceed 50,000 per cubic centimeter, or the average reduction time of which is not less than eight (8) hours, and which is produced upon dairy farms conforming with all of the following items of sanitation:"

Appellant cites these provisions and contends that the regulations or standards of the State Health Officer for grade A raw milk provide for a plate count of bacteria and for a microscopic count thereof, while the ordinance merely provides that the average bacteria count shall not exceed 50,000 per cubic centimeter, and does not state whether the bacteria count shall be by plate or microscopic count. It is therefore argued that the ordinance is in conflict with the rules and regulations of the State Health Officer.

■ Manifestly there is no conflict between the above quoted provisions. Each specifically provides for a bacterial plate count of 50,000 bacteria per cubic centimeter; the State Health Officer's standards providing for an alternative microscopic count. The ordinance refers to Sections 1(R) and 6 thereof for the method of determining the bacterial plate count, and the State Health Officer's rules refer to Sections 1(S) and 6 thereof for the method of determining bacterial plate count, or microscopic count. The provisions so referred to are entirely similar, if not identical, with respect to the method of making the average bacterial plate count, the reduction time, and the cooling temperature. No different provision is made for the microscopic count. Section 6 of the ordinance referred to provides:

"The examination of milk and milk products.—During each grading period at least four samples of milk and/or cream from each dairy farm and each milk plant shall be taken on separate days and examined by the Health Officer. Samples of other milk products may be taken and ex-

amined by the Health Officer as often as he deems necessary. Samples of milk and/or milk products from stores, cafes, soda fountains, restaurants and other places where milk or milk products are sold shall be examined as often as the Health Officer may require. Bacterial plate counts shall be made in conformity with the latest standard methods recommended by the American Public Health Association. Examinations may include such other chemical and physical determinations as the Health Officer may deem necessary for the detection of adulteration, these examinations to be made in accordance with the latest standard methods of the American Public Health Association and the Association of Official Agricultural Chemists. Bacterial plate counts, reductase test, and cooling temperature results shall be given to the producer or distributor concerned as soon as determined if said results fall without the limits prescribed for the grade then held. Samples may be taken by the Health Officer at any time prior to the final delivery of the milk or milk products. All proprietors of stores, cafes, restaurants, soda fountains, and other similar places shall furnish the Health Officer, upon his request, with the name of the distributor from whom their milk and/or milk products are obtained. Bioassays of the Vitamin D content of Vitamin D milk shall be made when required by the Health Officer in a laboratory approved by him for such examinations."

Section 6 of the rules and regulations of the State Health Officer provides:

"The examination of milk and milk products.—During each grading period at least four samples of milk and cream from each dairy farm and each milk plant shall be taken on separate days and examined by the health officer. Samples of other milk products may be taken and examined by the health officer as often as he deems necessary. Samples of milk and milk products from stores, cafes, soda fountains, restaurants, and other places where milk or milk products are sold shall be examined as often as the health officer may require. Bacterial plate counts and direct microscopic counts shall be made in conformity with the latest standard methods recommended by the American Public Health Association. Examinations may include such other chemical and physical determinations as the health officer may deem necessary for the detection of adulteration, these exam-

inations to be made in accordance with the latest standard methods of the American Public Health Association and the Association of Official Agricultural Chemists. Samples may be taken by the health officer at any time prior to the final delivery of the milk or milk products. All proprietors of stores, cafes, restaurants, soda fountains, and other similar places shall furnish the health officer, upon his request, with the names of all distributors from whom their milk and milk products are obtained. Bio-assays of the vitamin D content of vitamin D milk shall be made when required by the health officer in a laboratory approved by him for such examinations."

The further contention is made that the provisions of the ordinance which attempt to regulate the sale of milk or milk products at wholesale to creameries or to others for resale to the consumer conflict with the provisions of Sec. 7 of Art. 165—3, which reads:

"Sec. 7. The governing body of any city in the State of Texas may make mandatory, the grading and labeling of milk and milk products sold or offered for sale under the United States Standard Milk Ordinance within their respective jurisdictions as defined herein according to Definition (P) Section 1 for grades 'A', 'B', 'C', and 'D' Raw milk or Milk Products, and Definition (Q) for grades 'A', 'B', and 'C' pasteurized milk or milk products by adopting an ordinance to that effect and by providing the necessary facilities for determining the grades and for the enforcement of this Act. Provided, however, the provisions of this Section shall apply only to milk or milk products, sold or offered for sale by any person, partnership, or corporation directly to the consumer of such milk or milk products."

We are of the view that this section relates only to cities or towns passing ordinances for the purpose of making mandatory grading and labeling of milk "under the United States Standard Milk Ordinance * * * by adopting an ordinance to that effect." The ordinance of the City of Austin does not show that it was so intended, but that it was intended to adopt the provisions of the last paragraph of Sec. 2 of Art. 165—3, which provides that "any city adopting any specifications and regulations for any grade of milk shall be governed by the specifications and regulations promulgated by the State Health Officer, as herein authorized." Both Sec. 6

of the rules and regulations of the State Health Officer and Sec. 6 of the Ordinance hereinabove quoted at length are identical and provide for the taking of samples of milk or milk products from stores, cafes, etc., for testing by the City Health Officer.

Sec. 18 of the ordinance provides:

"Whoever shall do any act or thing prohibited, or neglect or refuse to do anything or act required by the terms of this Ordinance, or in anywise violate the provisions thereof, shall be fined not less than $25.00 nor more than $200.00."

Sec. 8 of Art. 165—3 provides:

"Whoever violates any provision of this Act shall be fined in the sum not less than Twenty-five ($25.00) Dollars nor more than Two Hundred ($200.00) Dollars and each separate violation shall constitute a separate offense."

Appellant contends that the ordinance prescribing a penalty of not less than $25 nor more than $200 is in violation of Art. 1165, which provides with respect to Home Rule cities that "no charter or any ordinances passed under said charter shall contain any provision inconsistent with the Constitution or general laws of this State." Manifestly there is no inconsistency or conflict between the penalty provisions of the state law and the ordinance. They prescribe the same penalties.

█ Nor is the contention tenable that the ordinance prescribing a fine of not less than $25 nor more than $200 for violation of any of its provisions is in conflict with Art. 1011 and Sec. 5 of Art. 1146, which provide that certain cities or towns may not impose a fine of more than or in excess of $100. It is our view that the statutes cited relate to the powers of cities or towns incorporated under either the general laws of this state or those incorporated by special law. They do not relate to those incorporated under home rule charters. The home rule city derives its powers under the provisions of Sec. 5 of Art. 11 of the Texas Constitution and the enabling statutes. Articles 1165 to 1182e, both inclusive.

█ The Supreme Court held in the case of the City of Sherman v. Municipal Gas Company, 133 Tex. 324, 127 S.W.2d 193, that the various statutes of Texas and Sec. 5 of Art. 11 of the Texas Constitution provide for the incorporation of three classes of municipal corporation: (1) Those incorporated under general laws; (2) those incorporated under special laws; and (3) those incorporated under home rule charter; and that those incorporated under general or special laws have a distinct legislative classification from those incorporated under home rule charter. Numerous Texas cases also hold that the only limitation imposed on the powers of the home rule city to adopt any charter provision or ordinance provision thereunder is that such provision shall not be inconsistent with any provision of the constitution or the general laws of Texas relating to the same matters or subject. See Yellow Cab Transit Co. v. Tuck, Tex.Civ.App., 115 S.W.2d 455, writ refused; Xydias Amusement Co. v. City of Houston, Tex.Civ.App., 185 S.W. 415; City of Houston v. State, 142 Tex. 190, 176 S.W.2d 928; Ex parte Newberg, 140 Tex.Cr.R. 211, 143 S.W.2d 786. In the instant case the penalties prescribed by Sec. 8 of Art. 165—3 are the same as those prescribed by the ordinance, and manifestly there can be no conflict or inconsistency between them. The statute itself required that the city adopt an ordinance not inconsistent therewith, or with the specifications and regulations promulgated by the State Health Officer. The statute also imposed penalties of from $25 to $200 for the violation of any standards or regulations promulgated by the State Health Officer, and further provided that "any city adopting any specifications and regulations for any grade of milk shall be governed by the specifications and regulations promulgated by the State Health Officer." Thus the city was limited by the statute and was required to impose the same penalties prescribed by the statute for violation of such regulations and provisions of the ordinance. To hold otherwise would bring the matter under the rule which inhibits a city from providing for penalties different from those covered by penal laws relating to the same matter or subject.

The judgment of the trial court is affirmed.

Affirmed.