**CITY OF DALLAS et al. v. ROSENTHAL.**
No. 14320.

Court of Civil Appeals of Texas.
Dallas.

April 13, 1951.

Rehearing Denied May 11, 1951.

H. P. Kucera, City Atty., and H. Louis Nichols, Asst. City Atty., W. R. Hemphill, all of Dallas, for appellants.

Storey, Sanders, Sherrill & Armstrong, Dallas, for appellee.

YOUNG, Justice.

This is a second appeal; on first appeal the dissent of Associate Justice Looney becoming, on rehearing, the majority opinion of this Court. The cause was there "reversed and remanded to the trial court for further proceedings," Judge Looney having set forth and discussed the various error on which reversal was based. On application for writ of error to the Supreme Court by the City and residents of the neighborhood (interveners), the writ was refused, "no reversible error." See Tex. Civ.App., 211 S.W.2d 279 for factual background of the present controversy and conclusions reached by the majority, necessitating another trial.

Appellants (City and interveners) have again, on this trial, sought injunction against appellee Rosenthal (sometimes referred to as defendant), charging that his business as conducted at 3307 Lemmon Avenue, Dallas, constituted a public and private nuisance, also that maintenance of same at said location was in violation of existing zoning laws; defendant answering by general denial, assertion of vested rights in the property and operation of business at a location designated as nonconforming use in an apartment district and reliance on valid permits from office of City Building Inspector for a substantial investment of money. On basis of jury answers to 84 special issues, the City and interveners were denied all relief by way of injunction; defendant, on the other hand, being granted an injunction permanently restraining appellants from interfering with or molesting him in the operation of his business on the premises in question as presently carried on, except the smoking of meats, and from interfering with his completion of the garage building on the premises and use of the garage after completion. From such judgment final, the City of Dallas has seasonably taken an appeal along with two of the original 26 adjacent and intervening property owners.

Naturally the conduct of this, a second trial of the cause, both in pleading and procedure was patterned upon the findings and conclusions of the majority in its previously cited opinion of reversal and remand; and the errors which this Court has held were committed on the former trial should be detailed prior to an analysis of the jury issues and answers on which the present judgment was based.

In the opinion of Judge Looney, the following errors were apparent in the record, generally by way of court rulings and character of judgment rendered on said former trial: (1) That the nonconforming use in an apartment house district had not been abandoned by Rosenthal's predecessor in title and was in existence at time of the latter's purchase of property at 3307 Lemmon (Lots 11, 12, and 13); such nonconforming use extending to and including the Lots (10, 14, 15, and 16) upon which defendant Rosenthal was building a garage when the stop order was served upon him;

(2) defendant had not subjected the property in question to a new and substantially different use, the "evidence" showing that Rosenthal had continued a use of the property for "cold storage and its accessory purposes" as that term had been construed and administered by the officials of the City of Dallas; (3) that the City permit to Rosenthal of August 1944, through its Assistant City Building Inspector, "'for the erection, remodeling, repairing and demolition of buildings, or parts thereof, as provided in the Dallas Building Ordinance' for the operation at the same place of a cold storage plant, including meat storage and curing, was authorized and valid; and not having been appealed from by the City authorities or interested citizens, cannot now be collaterally attacked"; (4) any infraction of regulations incident to defendant's failure to obtain additional permit for extra expenditures involved in erection and alteration of buildings, also for failure to obtain a certificate of occupancy ("a mere ministerial act") after completion of the remodeling and alterations, was waived by the City authorities "who from time to time inspected the buildings as the work progressed"; being further estopped from complaining of Rosenthal's failure to obtain additional permit and certificate of occupancy; (5) the City was fully cognizant of all the facts prior to issuance of permit which it later asserted as grounds for injunctive relief; and defendant, after 18 months and incurrence of heavy expenditures in reliance on permit, had acquired vested rights, and the City's later action in revocation of permit was arbitrary and unreasonable; (6) that on said first trial the court erred in refusing certain defensive issues (appearing in the instant court's charge as Issues 62, 68, 71, 72, and 73); (7) in the record on first appeal, the majority found no evidence of fraud or deception practiced by defendant in obtaining of building permits.

The jury issues and answers are lengthy but must be presented at least in substance. By way of clarification, such answers are shown by divisions and according to germane subject matter, with emphasis on material wording (number of issue being given at beginning of each paraphrased answer):

## NUISANCE.

Odors: (1) The operation of defendant's plant created odors; (2) which spread to neighboring properties; (3) which are offensive and obnoxious; (4) which substantially impaired the reasonable use and enjoyment of the residential properties near said plant by the occupants thereof; (5) the odors do not materially interfere with the reasonable use and occupancy as a home of the residential property in the near vicinity of said plant by persons of ordinary habits and ordinary tastes and sensibilities; (62) odors can be detected by persons of ordinary sensibilities on the outside of defendant's plant and beyond the boundary of his property; (63) such odors are *not* injurious to the health or property of the interveners.

Odors, Noise and Smoke: (6) The operation of defendant's plant created noises; (7) such noises are audible at the homes in the vicinity of said plant; (9) such noises do not materially interfere with the reasonable use and occupancy as a home of the residential property in the near vicinity of the plant by persons of ordinary habits and ordinary tastes and sensibilities; (10) such noises do not materially interfere with the reasonable use and occupancy of the residential properties near the plant by the occupants thereof; (14) the odors and noises considered together do not materially interfere with the reasonable use and occupancy as a home of the residential property in the vicinity of the plant by persons of ordinary habits and ordinary tastes and sensibilities; (15) the odors and noises taken together do *not* substantially impair the reasonable use and enjoyment of the residential properties in the near vicinity of the plant by the occupants of said residential properties; (64) the odors, noise and smoke from defendant's plant were more than the odors, noise and smoke resulting from the operation of the previous ice manufacturing business; (65) the odors, smoke and noise from the operation of the M. K. T. Railroad were less offensive than

those from defendant's plant; (66) the noise, odors and smoke from the operation of defendant's plant were not injurious to the property of the people residing in the immediate neighborhood of defendant's place of business; (67) the noise, odors and smoke were the result of natural uses of the property, industries and railroad in the neighborhood involved; (83) the noise and traffic congestion, exclusive of that caused by defendant, on Lemmon Avenue in front of defendant's plant *are more* than those resulting from the operation of defendant's plant.

Nonconforming Use: (16) The owners of Lots 11, 12, and 13 did not abandon the nonconforming use to manufacture ice thereon prior to the time defendant purchased the property; (17) the prior owners of Lots 10, 14, 15, and 16 did not abandon the nonconforming use to manufacture ice thereon prior to defendant's purchase of such property; (69) defendant's predecessor in title contemplated and intended to operate and make use of all the lots now owned by defendant here involved as a whole for ice manufacturing continuously until the sale to defendant; (70) defendant's predecessor in title did use the property involved for ice manufacturing, cold storage business or other business purposes until the sale to defendant in August 1944; (81) defendant has been and is now using Lots 10, 14, 15, and 16 since purchasing same for necessary parking, driveways, and storage purposes of his business.

Cold Storage: (19) Defendant is not primarily engaged in the operation of a cold storage plant; (44) at the time defendant purchased Lots 11, 12, and 13, he did intend to use said lots primarily for the operation of a cold storage plant; (80) defendant's plant has been continuously operated substantially the same as other similar cold storage plants including meat storage and curing in the City of Dallas, Texas; (26) defendant represented to plaintiff that Lots 11, 12, and 13 would be used for the operation of a cold storage plant, including meat storage and curing; (27) such representations were made for the purpose of securing a building permit; (28) at the time defend-ant made such representations, he did intend to comply with such representations; (29) the City would not have issued such building permit but for such representations; (30) defendant represented to plaintiff that the premises would be used for cold storage purposes only and, in connection with the operation of the cold storage business, that certain meats being placed in cold storage would be trimmed and that such trimmings would be ground and made into sausage; (31) such representations were made for the purpose of securing a building permit; (32) at the time such representations were made, defendant *did* intend to comply with such representations; (33) the City would not have issued such building permit but for such representations.

Garage: (38) Defendant represented to plaintiff that the cost of the garage building would not exceed the sum of about $1,250; (39) such representations were made for the purpose of securing a building permit; (40) at the time such representations were made, defendant did intend to comply with such representations; (41) the City would not have issued such building permit but for such representations; (54) at the time he applied for the permit to build a garage on January 26, 1946, defendant *did not* intend to materially increase the cost and size of the said garage over and above the cost and size described in his application; (68) defendant substantially complied with the plans, specifications and method of construction as described in his purported permit for a garage.

Permit for Main Building: (22) Defendant represented to plaintiff that the improvements to be made on the existing building would consist only of partitions and installation of equipment and that the cost of such work would be in the amount of about $4,000; (23) such representations were made for the purpose of obtaining a building permit; (24) at the time such representations were made, the defendant did intend to comply with such representations; (25) City would not have issued permit but for such representations; (45) defendant enlarged and extended the existing building

on Lots 11, 12, and 13; (45–A) defendant enlarged and extended without having obtained a building permit; (84) defendant did not substantially comply with the plans and specifications described in the building permit regarding the improvements to be made on the main building; (46) at the time he applied for a building permit on August 7, 1944, defendant *did not* intend to materially enlarge and extend the original ice plant structures then existing on Lots 12 and 13; (72) the changes, additions and alterations made by the defendant at his plant were made with the knowledge and acquiescence of the Building Inspector of the City of Dallas; (73) defendant made substantial improvements and expended substantial sums of money on his place of business in question with the knowledge and acquiescence of the Building Inspector of the City of Dallas for the period beginning August 1944, and until the time of the attempted cancellation of the permit in March 1946.

Use for Apartment Purposes: (71) The property in question is suitably situated for apartment purposes; (82) the injury, if any, to the plaintiffs and interveners caused by the operation of defendant's plant is slight in comparison with the injury which will be suffered by defendant, if he is required to use his property for apartment purposes only.

Meat Processing Permit: (74) The City Health Officer and his assistants recognized and approved the operation of the meat processing plant of defendant at 3307 Lemmon Avenue at all times since operations began at said location; (76) defendant's processing permit No. 52–M has been canceled; (75) the City Health Officer and his assistants have continuously recognized defendant's permit No. 52–M since its issuance as including the operation of his plant at 3307 Lemmon Avenue.

Smoking and Cooking of Meats: (50) At the time he applied for a building permit on August 7, 1944, defendant intended to install on said premises ovens and appliances for smoking and cooking of meats; (52) he failed to disclose such intention to the City of Dallas; (53) such failure to disclose was

with the intention to misrepresent his purpose in seeking his permit; (34) defendant *did not* represent to the plaintiff that there would be no smoking of meats on the premises and that there would be nothing done on the premises that would cause smoke.

Canning: (58) At the time he applied for a building permit on August 7, 1944, the defendant intended to use the building for the purpose of canning meat products; (60) defendant failed to disclose such intention; (61) defendant's failure to disclose such intention was not to misrepresent his purpose in seeking said permit.

Meat Processing Permit: (77) Defendant has at all times substantially complied with all of the rules, regulations and demands of the City Health Officer and his assistants, including the payment of all inspection fees assessed against him as affecting his plant at 3307 Lemmon Avenue in the City of Dallas, Texas; (78) the City Health Officer and his assistants recognized and permitted the operation of defendant's plant at 3307 Lemmon Avenue under permit No. 52–M until the application for processing permit was signed by defendant in December 1949; (79) the application for processing permit signed by defendant in December 1949, was for the primary purpose of enabling the City Health Authorities to determine the amount of taxes or fees that were due under the City ordinance relative to inspection of meat processing plants.

Meat Packing: (20) Defendant is not using the premises described as Lots 11, 12, and 13 at the present time for the operating of a meat packing plant; (21) defendant is not at the present time using Lots 10, 14, 15, and 16 in connection with the operation of a meat packing plant.

 It will be observed that all issues involving nuisance were answered adversely to the City and interveners, which jury answers find support in the testimony. Thus the element of nuisance relative to defendant's business and method of operation goes out of the case without further consideration or reference. Here we must notice the strongly urged counterpoint of appellee that

the trial court should have limited the pleadings of appellant with respect to the remaining issue (violation, or not, of zoning laws), since the opinion of this Court on former trial has established the "law of the case." Aside from the fact that the trial was on amended pleading (fourth amended original petition, fifth amended answer, with supplements, trial amendments, etc.), the dominant issues between the parties (nuisance and violation of zoning laws) were again litigated substantially without change. Even so, an appellate court is not precluded from considering all issues properly before it "and making such rulings now as it deems proper under the record in the case, irrespective of former opinion. Kempner v. Huddleston, 90 Tex. 182, 37 S.W. 1066; Green v. Priddy, 112 Tex. 567, 250 S.W. 656." Burrage v. Hunt Production Co., Tex.Civ.App., 114 S.W.2d 1228, 1236. See, also, 14 Texas Law Review, p. 511; Brown v. Shaffer, Tex.Civ.App., 78 S.W.2d 1054; Connecticut General Life Ins. Co. v. Bryson, Tex.Sup., 219 S.W.2d 799.[1]

By appellant, as hereinafter referred to, is meant the City of Dallas. The record is voluminous (statement of facts 1209 pages, transcript actually 311 pages, 150 exhibits, with briefs of the parties in proportion). Points of error relied on by appellant (41 in number) occupy some 18 pages of its brief, rendering impracticable the usual summary thereof. Sufficient for the purpose is an outline of the City's grounds for injunction (refused by trial court) as set forth in its statement of nature of the case. It is claimed that defendant Rosenthal was violating the zoning ordinance and building code of the City, in that: (a) He was using the premises in question without having obtained a certificate of occupancy as required by said laws and regulations; (b) was operating a meat processing and canning plant in an area zoned for apartment usage; (c) the building permit issued to defendant by the City under which the former was authorized to install partitions and equipment in an existing building (old cold storage plant) is void, with no accrual of vested rights, because said permit was issued through misrepresentations made by Rosenthal at time of issuance and because he did not substantially comply with the building permit in making additions to such existing building; (d) defendant made additions and extensions to the existing building without obtaining permit therefor, either from the Building Inspector or the Board of Adjustment; (e) defendant abandoned any nonconforming use which he may have had in Lots 11, 12, and 13 (cold storage site) by devoting said Lots to a new and different use not authorized by zoning laws in an apartment district; namely, by operating a meat processing establishment on said premises; (f) no nonconforming use existed in so far as the other Lots were concerned (10, 14, 15, and 16) because same were vacant and unimproved or had residences located thereon at time of passage of the 1929 zoning ordinance, and had not been devoted to a business usage prior to the time they were acquired by defendant in 1945; (g) the building permit issued by the City for construction of a garage on Lots 14 and 15 was void because issued in violation of zoning laws, no vested rights accruing because of such invalidity; and

1. As we have already seen, the application for writ of error filed by the City and interveners on prior appeal was disposed of by our Supreme Court with the notation "Application refused, no reversible error." Rule 483, Texas Civil Procedure, provides: " * * * In all cases where the Supreme Court is not satisfied that the opinion of the Court of Civil Appeals in all respects has correctly declared the law, but is of the opinion that the application presents no error which requires reversal, the Court will deny the application, with the notation 'Refused. No Reversible Error.' * * *." Under the rule just quoted it would appear that in one or more of the conclusions recited as necessitating a reversal of the cause on former appeal, the majority correctly stated the law (assuming, of course, that all errors set forth in above analyzed opinion of Judge Looney were duly presented in application for the writ). See article by former Supreme Court Justice Gordon Simpson in Southwestern Law Journal, Vol. 4, p. 398, discussing "Problems of Procedure Affecting Court of Civil Appeals Opinions."

(h) the stop order to cease work on garage building became res adjudicata, defendant not having appealed therefrom to the Board of Adjustment.

The matters chiefly at issue between the parties may be still more narrowly stated in the following: (1) Whether defendant's predecessors in title (old ice factory owners) had abandoned their nonconforming use in and to all the Lots in question at the time of the 1944 sale to Rosenthal of Lots 11, 12, and 13; (2) if not, whether defendant's business and method of operation constituted a continuation of the prior nonconforming use, or was a change therefrom, resulting in its termination; (3) whether the nonconforming use, if any, acquired by defendant extended to Lots 10, 14, 15, and 16, purchased in 1945 from the same prior owners; and, in the same connection, whether his permit of January 1946 to build a garage thereon was authorized, as accessory and incident to his alleged nonconforming business, and therefore not subject to cancellation by stop order of March 1946 after substantial construction was under way; (4) whether the permit of August 1944 for improvements on main building to be used "for cold storage including meat storage and curing" was obtained through misrepresentations; if not, was the Building Inspector authorized to issue the same; and (5) whether defendant's reconstruction of said old cold storage plant was in substantial compliance with such permit.

■■ Preliminary to any discussion of the matters generally in controversy in connection with the foregoing jury issues, we must consider identical points raised by the respective parties involving res adjudicata, each relying for support on the principle applied in Washington v. City of Dallas, Tex. Civ.App., 159 S.W.2d 579. It is contended by Rosenthal that the ruling of Hansen, Building Inspector, of August 1944,

construing the term "cold storage" as including his type of business and therefore a continuation of a nonconforming use, was immune to collateral attack by the City, it not having appealed from such decision to the Board of Adjustment as required by Art. 1011g, Vernon's Ann.Civ.St.; the City making a like contention with respect to its stop order of March 1946, which defendant likewise had not appealed to the same Board. Having pled that the rulings of its Building Inspector and issuance of the permits in question were in *violation of zoning laws,* the City, perforce of Art. 1011h, Vernon's Ann.Civ.St., was amply authorized to maintain the instant suit filed May 22, 1946; the latter article constituting a cumulative remedy independently and regardless of the provisions of Art. 1011g requiring an appeal to the Board.[2] Art. 1011g requires any person aggrieved, or officer, etc., to appeal from any decision of the administrative officer "within a reasonable time." Such reasonable time had not elapsed, it occurs to us, when the City in its petition for injunction placed in issue all matters that appellee was entitled to urge in any appeal to the Board. Hence appellant is in no position to complain of defendant's failure to pursue the remedy outlined in the particular Article (appeal to Board of Adjustment); the rule announced in Washington's appeal having no application.

First to be considered, in light of above manifold jury issues and answers (the court's basis of judgment), is appellants' claim of misrepresentations and deceit on part of Rosenthal in procurement of original permit. Only in issues 50 through 53 (smoking of meats) is the charge sustained. In consequence the smoking of meats is forbidden by aforesaid judgment; and removes from controversy all charges of fraudulent representations attributable to defendant.[3] Further sustained by the evi-

---

2. Pertinent language of the article last cited reads: "Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer, department, Board or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, * * *."

3. Language of Issue 50 includes the *cooking* of meats. We are cited to no testimony involving defendant in such further activity, with result that the italicized wording may be regarded as surplusage.

dence were the numerous jury answers involving full disclosure by defendant of all facts concerning his business and character of operation; also that his statements to the City Inspector of the proposed construction, both as to main building and garage, were made in good faith. Likewise supported by testimony are findings to the effect that prior owners of Lots 11, 12, and 13 had not abandoned the property as a nonconforming use for ice manufacture, cold storage, and other business purposes at time of sale to defendant; he having continued to operate the plant in substantially the same manner as other and similar cold storage plants were operated in the City of Dallas, including meat storage and curing. This was the construction placed on defendant's intended business operation by appellants' inspector after conference with the office of City Attorney; and on which defendant relied in purchasing aforesaid lots, securing permit, and undertaking the improvements in question pursuant to plans theretofore furnished.

But the City argues that such ruling of the Building Inspector was wholly unauthorized and violative of zoning, in that defendant's dominant business (meat processing and packing) falls in a lower classification (manufacturing), resulting in the termination of any nonconforming use (commercial) in an apartment district as a matter of law. A detail of the investigation made by Inspector Hansen in reaching the conclusion that defendant's business constituted only a continuation of the existing nonconforming use would unduly extend this opinion; and we merely call attention to the rule that a building permit, issued in accordance with zoning ordinances, can be revoked, after substantial expenditures, incurrence of obligations, or change of position, only for fraud and deceit. McQuillin on Municipal Corporations, 3rd Ed., Vol. 8, sec. 25.158. Section 17 of the original ordinance (2052, City Code, Art. 165.17) recites that its provisions "shall be administered and enforced by the building inspector of the City of Dallas." Under the facts and circumstances of this case, we conclude that the particular ruling was one the designated official was empowered to

make; thereby becoming a decision reviewable by the Board of Adjustment at instance of "any officer, department, board, or bureau of the municipality,"—which was not done.

Sufficiently analogous to the instant situation is Crow v. Board of Adjustment of Iowa City, 227 Iowa 324, 288 N.W. 145, 147, where petitioner, a veterinary surgeon, proposed to purchase certain property and erect thereon a hospital for treatment of dogs and small animals; calling upon the City Building Inspector, making full disclosure, and asking for permit. The inspector sought advice of the City Attorney; thereafter informing Crow that permit would issue. Relying on the advice, plaintiff purchased a lot, tore down existing building, making formal application for permit with accompanying plans and specifications. A few days after issuance, adjoining property owners filed an appeal to the Board of Adjustment, which body overruled the Building Inspector and the permit was thereupon canceled. On certiorari to the district court by Dr. Crow, the question turned on a construction of the word "hospital" (here, there was no definition of the term "cold storage plant" in the Dallas Zoning Ordinance). In course of its decision of reversal, the Supreme Court of Iowa held: "This interpretation was the duty of the building inspector and upon it was based the ruling and issuance of the controverted building permit. Apparently, no interpretation had been theretofore authoritatively made for his guidance. In making his decision he was compelled to rely largely upon the ordinance itself. In this situation he properly consulted with and secured the opinion of the attorney employed by the city for such purpose.

"The original ruling was based upon a broad definition of the word 'hospital'. Whether some other definition or interpretation would have been more proper or correct we do not determine nor intimate. The ruling of the building inspector was not clearly erroneous nor without basis. On the contrary the proposition was doubtful and fairly debatable and the language fairly susceptible to the interpretation given it. Hence it cannot be properly said that he

was without right or authority to grant the original permit. Call Bond & Mortgage Co. v. [City of] Sioux City, 219 Iowa 572, 259 N.W. 33."

Appellants' more serious complaint centers around the things done by defendant subsequent to issuance of permit for partitioning and equipment of the old ice factory plant; in which connection the jury has found that Rosenthal enlarged and extended the existing building on Lots 11, 12, and 13 without having obtained a permit; that he did not substantially comply with the plans and specifications regarding the improvements to be made on the main building; but that at time the representations were made he *did intend* to comply therewith and *did not intend*, on application for permit, to materially enlarge and extend the original structure. An aerial view of the premises in controversy is pictured below:

■ Here the City asserts as basis for injunctive relief that the numbered sections of building, 2, 3, 4, and 5, were enlargements and extensions of a nonconforming use; and that parts 2 (two-story annex) and 5 (engine room), in particular, were built without a permit, all in violation of the ordinance and building code. These contentions require a resume of pertinent evidence, viewed most favorably from the standpoint of appellee. The plans accompanying application for the August 1944 permit were more comprehensive than the permit recitals of "partitions and equipment" to be installed at a cost of about $4,000; one detail of said plans being to "vaporseal brick walls, insulate walls and ceiling." It is not disputed that defendant's plant covered no more than the area formerly occupied by the old ice factory, the two-story annex replacing the old cooling tower of concrete, steel and brick of the same height. According to Rosenthal, he told Inspector Hansen that the improvement contemplated by the permit was a job of remodeling to "suit our particular requirements"; testifying that the deviations from permit and plans were necessitated by finding, on commencement of work, an unforeseen weakening and deterioration of cooling tower walls, with similar unexpected difficulties in matter of old cork insulation and condition of roof, thereby running into unanticipated costs both in labor and material; the work continuing through the War period and as circumstances and finances would permit, from the fall of 1944 to early in 1946.

T. M. Hansen, Assistant Building Inspector until November 1944 (presently Fire Prevention Engineer, Fourth Army, San Antonio), testified that at time of issuance of permit, he understood the installation of partitions and equipment to include necessary repairs and remodeling of the old structure; that the recited cost of improvements ($4,000) was merely the contractor's or owner's guess as to such cost and was given no particular weight other than in determining the fee or charge for the permit in question; that he made several trips to the job late in the year 1944, work on the two-story annex having just begun. No further investigation was made of the work in progress until about March 1946, when Inspector Cummings visited the premises following a complaint of adjoining property owners; his later order to stop work issuing after completion of main building except for some windows and doors. Section 204 of Ordinance 2050, City Building Code, provides that "The Building Inspector shall inspect or cause to be inspected at various intervals erection, construction, enlarging, alteration, repairing, * * * all buildings and/or structures referred to in this Code * * *."

■ While defendant was at fault in not procuring an additional permit for the improvements later determined upon as necessary, all of the changes and deviations now complained of were well within the purview of initial discussions between building inspector and owner, and doubtless would have been included in the original permit if known. Upon the foregoing background of facts, the City having remained silent until practical completion of all work (and with the element of nuisance excluded), we are not prepared to say that the refusal of mandatory injunction by the trial chancellor was unwarranted. In exceptional cases (and surely this is one), a municipality, even in exercise of a governmental function, may be subjected to the same rules of equitable estoppel as are individuals where right and justice require it. "The opinion is expressed in a number of decisions that a city may be estopped even when it is acting in its public capacity if it has received or accepted benefit from the transaction." City of San Angelo v. Deutsch, 126 Tex. 532, 91 S.W.2d 308, 311. "The municipality may be estopped where the acts of its officers upon which the claim of estoppel is predicated were done within the scope and the course of their authority. The view is also taken that even when acting in a governmental capacity the municipality may, under some circumstances at least, be subjected to the same rules of equitable estoppel as are individuals, where right and justice, honesty and fair dealing require it. * * * The doctrine, however, must be

applied with caution in cases involving governmental functions of the municipality." 1 A.L.R.2d 357.

█ Moreover, one seeking equity must do equity by proceeding seasonably while his adversary has fair opportunity and means of protection, the maxim being applicable to the state, its divisions and instrumentalities when seeking equitable relief. 30 C.J.S.,Equity, § 91, p. 468. In State v. Jarmon, Tex.Civ.App., 25 S.W.2d 936, 942, where the Texas Railroad Commission was refused injunctive relief, the Court went on to say: "We conclude that under the case made the Commission has failed to do equity, that its conduct towards appellee has been arbitrary and unreasonable, and that, although appellee is technically at fault in proceeding without regard to Rule 37, the Commission is in no position to demand relief through a court of equity, and thereby punish appellee for the consequences of its own dereliction. We see no reason why the age-old maxim, that he who seeks equity must do equity, should not apply to the state and its instrumentalities, as well as to its humblest citizen."

█ Appellants further point to error of the trial court in refusal of restraint to defendant in his use of Lots 10, 14, 15, and 16 for any purpose other than those designated and permitted in an A–1 Apartment District, same forming no part of any nonconforming use that might have appertained to the former ice factory site (Lots 11, 12, and 13). The old ice factory owners had used Lots 14 and 15 long before zoning as a mule barn; later buying 10 and 16 in settlement of a lawsuit involving maintenance of nuisance, and moving away residences thereon. The jury found (issues 16, 17) that defendant's predecessors in title had not abandoned their nonconforming use in and to all the lots prior to defendant's purchase (Lots 11, 12, and 13 in August 1944, and 10, 14, 15, and 16 in June 1945). It is now contended that these vacant lots had lost any status of nonconforming use by their non-inclusion in initial purchase; in other words that the nonconforming use originally attaching to Lots 10, 14, 15, and 16 was merely incidental and ancillary to the ice factory site, sale of the latter lots in August 1944 constituting a severance and ipso facto reversion of the lots in question to apartment house usage under terms of the zoning ordinance. The situation presents an interesting question with respect to continuity or succession of a nonconforming use which we deem it unnecessary to decide. Lots 10 and 16 were obviously acquired by the old ice factory owners as a protection and buffer against complaints of adjacent property owners, and Lots 14 and 15 immediately adjoin a railroad right-of-way. From an examination of Exhibit 10 (see picture), these lots are seen to be practically worthless for apartment use; City of West University Place v. Ellis, 134 Tex. 222, 134 S.W.2d 1038; and otherwise of negligible value except (as found by the jury, Issue 81) "for necessary parking, driveway, and storage purposes" of defendant's nonconforming business.

Here it may be observed that the jury finding of substantial compliance by defendant with permit for building his garage has support in testimony that, with the same area involved, the plans were merely changed from a square to an "L" construction; that the structure was within $600 to $700 of completion at time of stop order, with increased costs chargeable largely to rise in price of labor and material.

The foregoing discussion has been with reference to points 1 to 14 inclusive of appellants' brief; being likewise applicable to points 15 through 18, involving generally the same grounds of error and argument that "The City finds itself confronted with this unique situation in which there exists a valid Building Code, a valid Zoning Ordinance, and valid police regulations which regulate the operation of meat processing plants which it cannot enforce." It is to be noted that the City is not now prohibited from present and future enforcement of ordinances and building regulations in actions either civil or criminal, aside from this equitable proceeding; the denial to it of injunctive relief relating to a situation of "fait accompli," i. e., to past or completed transactions; the jury having found that municipal inaction has caused appellee to so change his condition as that great damage would be inflicted upon him by grant of the

mandatory writ. On the other hand, these jury answers in sum are tantamount to findings of superior equities in favor of defendant, thereby entitling him and not the plaintiffs to a measure of restraint.

 Appellants in numerous points argue error of the court in submission of numbered issues as either evidentiary and not ultimate in effect; not raised in pleading or testimony; and either not supported by the evidence, or directly contrary thereto; followed by appropriate motion to disregard the jury answers in such connection. It may be that some of the issues complained of involve mixed questions of law and fact, others being merely evidentiary. Even so, they are seen to be in harmony with further and proper findings on ultimate issues relating to appellee's theory of defense; the defects of form and substance of such other issues being viewed as harmless in effect.

 However, in the same connection, the inquiry (Issue 71) of whether the property in suit was suitably situated for apartment use, though answered in the affirmative, was purely a question of law and subject to the objections made. As appellants correctly state, the only effect of an answer that the property is *not* suitably situated for apartment use would be that the City Council had improperly zoned the property in the first place, since there was no evidence of any material change in the surrounding neighborhood subsequent to original zoning classification of 1929. Accordingly, if the area was improperly zoned at that time, same could only have been the result of arbitrary and unreasonable action on part of the municipality. The courts of this State have consistently held that the question of whether or not a zoning ordinance is void as being arbitrary and unreasonable is one of law and not a matter for the jury's determination. City of University Park v. Hoblitzelle, Tex.Civ.App., 150 S.W.2d 169; City of Dallas v. Lively, Tex. Civ.App., 161 S.W.2d 895; King v. Guerra, Tex.Civ.App., 1 S.W.2d 373; Edge v. City of Bellaire, Tex.Civ.App., 200 S.W.2d 224.

Otherwise, upon full examination of all points of error, same are overruled and the judgment under review is affirmed.