**HOOTERS, INC., d/b/a Executive Room and Diana Goleman**

v.

**CITY OF TEXARKANA, TEXAS.**

No. 5:95CV58.

United States District Court,
E.D. Texas,
Texarkana Division.

May 30, 1995.

948

Steven H. Swander, Ft. Worth, TX, for plaintiffs.

Raymond W. Jordan and Randall D. Goodwin, Crisp, Jordan & Boyd, L.L.P., Texarkana, TX, for defendant.

## MEMORANDUM OPINION

FOLSOM, District Judge.

On May 15, 1995, the Court held a hearing on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. After hearing the evidence presented by both sides, the Court gave the parties the opportunity to submit briefs. Both parties submitted briefs on May 22, 1995. After considering all of the evidence, the Court finds that the motion is well taken.

### I. BACKGROUND

On January 25, 1995, Diana Goleman ("Goleman") applied for a permit for a sexually oriented business under Texarkana Ordinance No. 202–94 (the "Ordinance"), including a non-refundable application fee of $400.00. The proposed business was to be located at 101 West Front Street, Texarkana, Texas ("Union Station"). Goleman stated in the application that 1) the sexually oriented business was to be "Hooters, Inc., ("Hoot-

ers")[1] dba Executive Room" and 2) the type of business was to be an "Adult Cabaret, or food service, private or public parties and meeting area." On January 27, 1995, Dick Moore, the Planning Administrator for the City of Texarkana, sent a letter to Goleman stating that the proposed location was not within 1,000 feet of a church or school. On February 2, 1995, a Sexually Oriented Business License ("License") was issued by Gary Adams ("Adams"), the Texarkana Chief of Police. The Plaintiffs began remodeling and Goleman has testified that the expenditures for this remodeling have approached $100,-000.00. On May 8, 1995, the evening that the Executive Room was scheduled to open, Adams revoked the License declaring that the Executive Room was within 1,000 feet of a church. Adams stated that this church was within the Bowie County Correctional Center located at 105 West Front Street ("BCCC"). On May 10, 1995, Hooters filed a complaint alleging that by revoking the License, the City of Texarkana (the "City") violated Hooter's right to free expression under the First Amendment, as well as Hooter's right to substantive and procedural due process under the Fourteenth Amendment of the United States Constitution, and Article 1, Section 19, of the Texas Constitution. Accompanying this complaint was a motion for the injunctive relief which is at issue here. At the hearing held on May 15, 1995, the Court added Goleman as a necessary party for judicial economy.

### II. DISCUSSION

The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable loss of rights prior to judgment. *Compact Van Equip. Co. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir.1978). The requirements which must be shown before the Plaintiffs will be entitled to preliminary injunctive relief are:

1) a substantial likelihood that Plaintiffs will prevail on the merits;

---

1. This is a Texas corporation and is not associated with the national chain of restaurants with the same name.

2) a substantial threat that irreparable injury will result if the injunction is not granted;

3) that the threatened injury outweighs the threatened harm to Defendant; and

4) that granting the preliminary injunction will not disserve the public interest.

*Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985). Considering these factors and the evidence presented, the Court finds that the Plaintiffs satisfy the requirements for the issuance of a preliminary injunction.[2]

■ First, the Plaintiffs may suffer irreparable injury if an injunction is not issued. The nude dancing sought to be performed at the Executive Room is expressive conduct "within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566–67, 111 S.Ct. 2456, 2460–61, 115 L.Ed.2d 504 (1991). There is a strong presumption of irreparable injury in cases involving infringement of First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.*

The Plaintiffs also assert that this dancing is the primary drawing card for the restaurant associated with the Executive Room. This raises pecuniary concerns. Because the Executive Room is a new business, it would be very difficult to later calculate damages were it not allowed to open, i.e. it is difficult to ascertain the profits of a business which did not exist prior to the period when the damages occurred. When the nature of a plaintiff's loss would make damages difficult to calculate, the injury is not fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d. 507, 511 (6th Cir.1992). These imprecise damages also include the loss of customer goodwill. *Id.* at 512. The Plaintiffs have shown both a strong constitutional and strong pecuniary basis for irreparable injury.

■ Second, the threatened harm to the Plaintiffs outweighs the threatened harm to the City. The relative size and strength of each party may be pertinent to this balance of hardships. *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 827 (9th Cir. 1993). As discussed above, the continued closing of the Executive Room poses a great threat to the Plaintiffs. Conversely, a temporary opening would pose minimal threat to the City as it is unlikely that the City's concerns over the secondary effects of the Executive Room, articulated in both the Ordinance and the Defendant's Brief in Opposition, will be significantly realized in the time it will take this case to proceed to trial.[3] Furthermore, the City possesses inherent police power to help control these secondary effects were they to occur.

■ Third, a preliminary injunction will not disserve the public interest. Rather, it is in the public's interest to protect rights guaranteed under the Constitutions of both the United States and Texas. Even a temporary prohibition of the exercise of these rights is extremely undesirable. While there are undoubtedly many individuals who strongly oppose the activity expected to occur within the Executive Room, the distaste for this type of sexual behavior must yield to the prevention of the alleged infringements of Constitutional rights.

Finally, the Plaintiffs have made a preliminary showing that they have a substantial likelihood of prevailing on the merits. This should not be interpreted to mean that the Court has concluded that the Plaintiffs will ultimately prevail on the merits. It means that after considering both the respective claims and defenses at this stage, the Court finds that the Plaintiffs could indeed prevail. In fact, because the Plaintiffs have made a strong showing of the other three requirements in this case, they are really only required to show that there is "some" likelihood of success on the merits in order to justify temporary injunctive relief. *Productos Carnic, S.A. v. Cent. Am. Beef, Etc.*, 621

---

**2.** The analysis of whether there is a substantial likelihood that the Plaintiffs will prevail on the merits follows the discussion of the other three considerations.

**3.** The trial date for this case will be set for August 1, 1995.

F.2d 683, 686 (5th Cir.1980). The Court finds that the Plaintiffs have shown a "substantial likelihood" of prevailing, even though only required to meet the lower standard of establishing "some" chance of prevailing.

The Plaintiffs can succeed on the merits of this case by showing that: A) their application for a sexually oriented business was not deficient, B) the issued License allows Hooters to participate in the operations of the Executive Room, and C) there is neither a "church" nor a "school" inside the BCCC. Furthermore, even if the Plaintiffs were unable to prove one or more of these points, there is still a substantial likelihood that they can succeed by showing that D) the City is estopped or barred by laches from attempting to disprove these points.[4]

**A. The Application was not deficient.**

■ The City argues that the Plaintiffs have failed to obtain the necessary licenses to open and operate their business.[5] First, the City tries to establish that Goleman failed to identify that Hooters was an applicant. However, on page 1 of the Plaintiffs' Application for a License for a Sexually Oriented Business ("Application"), it is established that Goleman was an "Applicant" and that a "Corporation" was the "Type of Entity." Furthermore, the "Type of Entity" designation is within the heading of "Applicant" and obviously indicates the type of entity that is applying. On page 2 of the Application, "Hooters, Inc., dba Executive Room" is clearly designated as the name of the business. Finally, on page 5, Goleman signs the Application: Diana Goleman as "President." The Application itself clearly indicates that Hooters, Inc. was designated as an applicant.

Next, the City argues that the Plaintiffs failed to supply the required documentation under the Ordinance for a corporate applicant. The Ordinance sets out that if the applicant is a Texas Corporation, the applicant shall provide:

a certified copy of the Articles of Incorporation with Amendments; name and residential addresses of current officers and directors; and the name and address of each stockholder holding more than five percent (5%) of the stock of the corporation.

Ordinance § 15–33(e)(1). The Application included this information. It included a Certification from the State of Texas certifying that the Articles of Incorporation for Hooters, Inc. were filed in the Secretary of State's office and that Hooters, Inc. was not in dissolution. This Certification was obviously deemed to have substantially complied with the requirement because there has been no testimony on behalf of the City indicating that it requested Goleman to supply the actual Articles of Incorporation. A "Consent to Corporate Action in Lieu of Formal Meeting" was also included in the Application. This document provided the following:

Hooters, Inc., a Texas corporation, by Diana Goleman, sole shareholder, director, and president and secretary-treasurer, is hereby authorized and directed to take all necessary steps to sign sexually oriented license for the corporation of Hooters, Inc.

It was signed by Diana Goleman as "President, Secretary–Treasurer, Director and Sole Shareholder." Consequently, since the Application already included Goleman's name and residential address, and since Goleman indicated she alone held all positions of the officers and directors and that she was the only shareholder, the information required by Ordinance § 15–33(e)(1) was included within the Application. Moreover, the License was ultimately issued which further indicates that the Application was deemed sufficient.

**B. The License covers Hooters.**

■ The City next alleges that since there was never an application filed in the name of Hooters, Hooters is not legally eligible to

**4.** Because the Court bases its decision on A–D, the constitutional issues raised by the Plaintiffs' complaint need not be addressed at this time.

**5.** The Court does not address the argument that the Plaintiffs have not obtained the necessary specific use permit to operate as a "dance hall or

nightclub." In the event that the Plaintiffs should choose to operate as a "dance hall or nightclub" and this indeed violates a valid City Ordinance, then the City may take appropriate action.

operate at Union Station. Once again, Hooters was listed throughout the Application and was included both as "Corporation" under the "Applicant" section and "Hooters, Inc dba Executive Room" under the "Name of Business" section. The City offers that since it issued the License in the name of "Diana Goleman," Hooters somehow disappears from the equation. The Court does not accept this argument. First, Goleman is the sole shareholder of Hooters. Second, Goleman complied with the requirements for a corporate applicant. Third, the City issued the License. Fourth, in his May 8, 1995, letter revoking the License, Adams even refers to the License as "the sexually oriented business license of *Hooters, Inc. d.b.a. Executive Room* (emphasis added)." Fifth, Ordinance § 15–32 sets out that "[a] separate application and license shall be required for *each sexually oriented business* (emphasis added)." This means that even though the License was issued in Goleman's name, it had to have been for a particular business. This particular business, as listed on page 2 of the Application, is "Hooters, Inc. dba Executive Room."

The City also alleges that Goleman mislead the City by stating that the waitresses were going to wear "short-shorts" and tight T-shirts. The Application sets out that the "Type of Service at Sexually Oriented Business" was going to be an "*Adult Cabaret,* or food service, private or public parties and meeting area." The Ordinance defines an "Adult Cabaret":

> *Adult Cabaret* means a nightclub, bar, lounge, restaurant, or similar commercial establishment which provides or features:
>
> a) persons who appear in a state of nudity or "simulated nudity" . . . or
>
> b) live performances which are characterized by the exposure of "specified anatomical areas" . . . or
>
> c) [films or video cassettes depicting sexual activity or specified anatomical areas] or
>
> d) a combination of any of the above.

Ordinance § 15–31(5). The Application itself clearly indicates the type of business that the License was issued for.

In summary, since Goleman included Hooters as an "Applicant," provided the necessary information concerning Hooters, signed the Application as "President," and listed Hooters as the "business," there is a substantial likelihood that, at trial, the Plaintiffs could show that the Application was not deficient and that allowing Hooters to participate in the operation of the Executive Room does not conflict with Ordinance § 15–43.

**C. There is neither a "church" nor a "school" within the Bowie County Correctional Center.**

■ Adams revoked the License on May 8, 1995, stating that Hooters was not in compliance with Ordinance § 15–44 because it was within 1,000 feet of a church which is located in the Bowie County Correction Center ("BCCC").[6] Adams testified that he was made aware of this church on May 5, 1995, but that he did not investigate the matter until May 8, 1995, the evening of the planned opening of the Executive Room. The obvious question presented by this revocation is whether the BCCC truly contains a church.

Testimony at the hearing establishes that: 1) there is space within the BCCC used for worship, preaching and singing; 2) the actual space used for these activities has been shifted around the BCCC; 3) this space is not used exclusively for these activities; and, 4) the space now being used for these activities has been recently altered, possibly due to construction within the BCCC. Additionally, Sheriff Choate testified that this space is approximately 40 ft. × 60 ft. She further testified that the BCCC is made up of two annexes, one being approximately 300 ft × 80 ft and the other being approximately 100 ft × 80 ft. This totals out to a space of approximately 2400 sq. ft. in a facility which totals approximately 32,000 sq. ft.

The Plaintiffs assert that the County cannot fund a church but that it can legally provide religious services for inmates. The

---

6. This was the only reason stated for the revocation. All of the other justifications offered by the City were produced after the complaint was filed.

City argues that whether the area used for religious worship within the BCCC is a church should be determined by examining "church" as defined in the Ordinance. The City also argues, citing *Heard v. City of Dallas*, 456 S.W.2d 440 (Tex.Civ.App.—Dallas 1970, *writ ref'd n.r.e.*), that the meaning of a provision or definition in an ordinance should be determined by the object sought to be accomplished. Neither the definition of a "church" in the Ordinance nor the articulated reasons for distancing sexually oriented businesses from a church suggest that there is a church in the BCCC.

The Ordinance defines a defines a "church" as:

a building in which persons regularly assemble for religious worship and activities intended primarily for purposes connected with such worship or for propagating a particular form of religious belief.

Ordinance § 15–31(12). This definition suggests there is no church in the BCCC.[7] The enabling statute which authorizes the distance requirement for a church is Tex.Loc. Gov't.Code Ann. § 243.006 which establishes that "[t]he location of [a] sexually oriented business may be prohibited within a certain distance of a ... *regular place of worship* (emphasis added)." However, the Ordinance does not use such a broad description for its definition of a church. The Ordinance specifically narrows its definition by requiring that a church be a "building." Ordinance § 15–31(12). The testimony establishes that the space used for religious activities has not been stationary, but rather has been shifted around. To accept the City's argument that this space constitutes a "church" and therefore a "building" would require a finding that either the building moves every time the space used for worship moves or that the entire BCCC is a "church." Both of these are impermissibly illogical results.

The stated purposes for a specific distance requirement between "churches" and sexually oriented businesses also support a finding that the space within the BCCC is not a "church." The Ordinance sets out:

WHEREAS, City Council finds that churches and schools are *centers of family oriented activities* and therefore *enhance the quality of life in surrounding areas* and

WHEREAS, City Council finds that sexually oriented commercial enterprises can exert a *dehumanizing influence on persons attending churches* or schools in the surrounding area....

Ordinance preamble (emphasis added). The space within the BCCC is certainly not a "center of family oriented activity." In fact, the testimony establishes that families are not even allowed to participate in the worship services. As to the "enhancement" language, the Court recognizes that the religious activity which takes place in the BCCC may serve to "enhance the quality of life" for the *inmates* who utilize the activity. In fact, the Court hopes that it does and wishes to commend the County for providing a place for its inmates to engage in such activities. However, these activities cannot be said to enhance the value of life in the "surrounding areas." This is strongly evidenced by testimony which establishes that no one involved in this dispute, including representatives of the City, was aware of any religious activity taking place at the BCCC. Adams testified that he did not learn of the activity until May 5, 1995. He further testified that he requested Captain Reed to investigate the Application and that Reed did not find a church either. It is clear that even though the religious activity may, and hopefully does, enhance the "quality of life" of the inmates, this enhancement does not effect the surrounding neighborhood in the same degree and manner which true churches do. Finally, the preamble's state-

---

7. Even though the Court looks to the Ordinance in reaching its conclusion that the BCCC does not contain a church, it is notable that other cases have held that religious worship does not automatically create a church for zoning purposes. *See Coe v. City of Dallas*, 266 S.W.2d 181, 183 (Tex.Civ.App.—El Paso 1953, *no writ*) (holding that a proposed building that was to devote 2,400 square feet to healing and prayer rooms, but only 600 square feet to a "church proper" was not a church); *See Also Heard v. City of Dallas*, 456 S.W.2d 440, 444 (Tex.Civ.App.—Dallas 1970, *writ ref'd n.r.e.*) (even though a Episcopal Vicar conducted religious worship and training in his rectory, this did not change what was essentially a day nursery into a "church" exception for zoning).

ment concerning a "dehumanizing influence on persons attending churches" does not support the notion that the BCCC contains a church. The inmates at the BCCC are incarcerated and are not subjected to any influence of the Executive Room related to their religious worship. The inmates do not have to, nor can they, pass by the Executive Room on their way to engage in religious activities. The inmates may know that the Executive Room exists yet this is due to the fact that the Executive Room is close in proximity to the *BCCC*. There is no requirement in the Ordinance that the Executive Room must be 1,000 feet from any jail or detention center.

The City, citing *Calvert v. Kadane*, 427 S.W.2d 605, 608 (Tex.1968), argues that the Court should give weight to the construction placed upon doubtful or ambiguous statutes or ordinances by the agency charged with their administration. However, it is also recognized that:

> [a]ny statute or ordinance which proscribes certain conduct must be sufficiently definite to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," and to avoid the possibility of arbitrary and erratic arrests and convictions.

*Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir.1980) (*citing Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971)).

Even Adams testified that there was no way for a lay person to know of the religious activity taking place within the BCCC. Additionally, there was no sign on the street indicating that religious services were occurring inside. Once again, no one involved in the issuance of the License, including Adams or any other City official, was aware of the activity taking place within the BCCC.[8] Even had someone been aware, they should have concluded that this activity did not transform the BCCC, or any part thereof, into a church.

The City also argues that there is a "school" in the BCCC, an argument which the City has only raised after the revocation of the License. There was testimony establishing that the BCCC has established a GED program for inmates which is unquestionably a positive opportunity for the prisoners who utilize it. However, the same reasons why there is not a church in the BCCC support a finding that there is not a school.

As defined in the Ordinance, a "school" "means and includes public and private, primary and secondary educational facilities, providing education up through and including the 12th grade level." Ordinance § 15–31. The BCCC is not an educational "facility" and the availability of some educational materials does not change this. Furthermore, interpreting "facility" to include such activity would not further the intent of the Ordinance. The GED program is not a "center of family activities," it does not "enhance the quality of life in the surrounding areas," and the presence of the Executive Room would not "exert a dehumanizing influence" on the inmates relating to their educational endeavors. The clear intent of the distance requirement for schools is to protect children and adolescents, an essential consideration for zoning decisions. The finding of a school in the BCCC would neither fit the definition of "school" within the Ordnance nor would it further the intent of the Ordinance.

> D. The City is prevented from disproving the points discussed in A, B and C, by the equitable remedies of either estoppel or laches.

Even if the Plaintiffs eventually fail to prove the points discussed in A, B and C (or any combination thereof) at trial, there is a "substantial likelihood" that they could effectively invoke the doctrines of estoppel or laches. The law on estoppel and laches in the zoning context is not completely lucid.[9] The primary Texas case supporting equitable relief is *Rosenthal v. City of Dallas*, 211 S.W.2d 279 (Tex.Civ.App.—Dallas 1948, *writ*

---

8. This also applies to the City's argument that the Plaintiffs mislead the City when they indicated on the Application that the Executive Room was not within 1,000 feet of a "church."

9. For a comprehensive discussion of the cases on this issue, *See* MIXON, TEXAS MUNICIPAL ZONING 2nd Ed (1993).

*ref'd n.r.e.*). The *Rosenthal* court held that the City of Dallas was estopped from revoking a permit for a meat processing plant that was in violation of zoning ordinances. The court reached this result due to a building inspector's statements coupled with the city's failure to timely object as work progressed and substantial money was spent. *Id.* at 291–93.[10] On retrial, this position was affirmed. *City of Dallas v. Rosenthal,* 239 S.W.2d 636 (Tex.Civ.App.—Dallas 1951, *writ ref'd n.r.e.*). Additionally, *Town of Highland Park v. Marshall,* 235 S.W.2d 658, 664 (Tex. Civ.App.—Dallas 1950, *writ ref'd n.r.e.*), applied either estoppel or laches and prevented the city from enforcing an ordinance due to the city's acquiescence of violations of the ordinance for several years.

The City points out that these cases have been criticized and have not been followed. However, even courts which have not followed *Rosenthal* have recognized its existence:

> There is authority for the proposition that a municipality may be estopped in those cases where justice requires its application, and there is no interference with the exercise of its governmental functions. But such a doctrine is applied with caution and only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice.

*City of Hutchins v. Prasifka,* 450 S.W.2d 829, 836 (Tex.1970) (citing *City of Dallas v. Rosenthal,* 239 S.W.2d 636).

The City further points out that the *Rosenthal* decision has been characterized as a maverick case. BLACK & DANIEL, THE TEXAS RULE OF ESTOPPEL IN ZONING CASES, 33 Baylor L.Rev. 241, 247 (1981). However, Black and Daniel harmonize *Rosenthal* with other estoppel cases by concluding that the property owner in *Rosenthal* relied on an "authorized" act of the city. *Id.* The Court finds that even though there are many cases holding that a city cannot be estopped or barred by laches due to actions of its agents, there is

an exception for special circumstances if the act was "authorized."

There are special circumstances in this case and the act of issuing the License was authorized. The Plaintiffs applied for a permit and paid a non-refundable $400.00 application fee. The Application was approved and the Plaintiffs were issued the License. The Plaintiffs proceeded to spend close to $100,000.00 remodeling the Executive Room over a period of several months. On the evening of the planned opening, the City, through Adams, revoked the License. It was Adams' sole decision on whether to grant the License. There was no method established which would have allowed the Plaintiffs to appeal an adverse decision by Adams to a City board and thereby obtain an "official" decision of the City. Rather, the Ordinance provides that if an applicant or licensee is dissatisfied with the decision of the Chief of Police (Adams), he may appeal to the District court of Bowie County. Ordinance § 15–42. This clearly establishes that Adams himself had the authority to: 1) decide whether the Application was sufficient, 2) determine whether there was a church within 1,000 feet of the Executive Room, and 3) issue the License.[11] Adam's authorized acts in conjunction with the special circumstances of this case, could warrant the application of estoppel and/or laches.

In summary, even if the Plaintiffs fail at trial to prove that their Application was not deficient, the License includes Hooters and that there is neither a church nor a school inside the BCCC, they still have a "substantial likelihood" or at the very least "some chance" of succeeding by invoking the equitable doctrines of laches or estoppel. While the Court recognizes that these doctrines are rarely effectively invoked against municipalities, the "authorized" actions and determinations by Adams, the failure of the City to object while substantial money was being spent, and the other exceptional circum-

---

10. The dissenting opinion became the majority opinion after Justice Bond joined the dissenting opinion.

11. The Ordinance grants the Chief of Police twenty-one (21) days to investigate the applica-

tion and background of the applicant and further provides for a reasonable extension of this investigatory period. Ordinance § 15–33(g). In this case, the License was issued just nine (9) days after the application was submitted.

stances of this case should warrant the application of an equitable remedy for the Plaintiffs.

### III.   CONCLUSION

From a review of the evidence submitted and the arguments by the respective parties, the Court finds that the Plaintiffs have met the requirements entitling them to a preliminary injunction pending a trial on the merits.