In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00061-CV


______________________________




MAGUIRE OIL COMPANY, ET AL., Appellants



V.



CITY OF HOUSTON, Appellee




 


On Appeal from the 55th Judicial District Court


Harris County, Texas


Trial Court No. 93-55813




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Justice Ross



O P I N I O N



 Maguire Oil Company (1) (Maguire) appeals the summary judgment granted in favor
of the City of Houston. Maguire sued the City alleging damages when the City revoked a
permit authorizing Maguire to drill a gas well near Lake Houston, a freshwater reservoir and
the City's main source of drinking water. 

 In its petition, Maguire claimed it applied for and received a permit from the City on
May 7, 1991. The City ratified and modified the permit on May 22, 1991, and extended the
permit on August 5,1991. The location of the well was on the shore of Lake Houston,
approximately 300 feet from the lake. 

 Maguire claimed it began preparing the land for drilling, signed a drilling contract,
purchased nearby leases for the purpose of offset drilling, and began moving equipment
onto the drilling site. On October 31, 1991, the City issued a stop work order. In a
separate letter sent to Maguire's attorney, the City acknowledged the permit "appear[ed]
to have been issued in error" and revoked it, effective immediately. The letter referenced
Houston Code of Ordinances Sections 23-101 and 23-102, which at the time prohibited
drilling a well within the City's extraterritorial jurisdiction (ETJ) (2) and 1,000 feet of the normal
water's edge of Lake Houston. 

 Maguire sought a judgment declaring the permit valid. It also sought a declaration
that Section 23-102 is unreasonable in that it makes no provision for special circumstances
and it discriminates against oil and gas wells by allowing other types of wells to be drilled
within the 1,000-foot limit. (3) Maguire sought a further declaration that the City engaged in
selective enforcement of Section 23-102 by allowing other oil and gas wells to be drilled
within the 1,000-foot limit. 

 Further, Maguire alleged the City's actions amounted to inverse condemnation of
its mineral interests in violation of the Due Process Clauses of the Fifth and Fourteenth
Amendments to the United States Constitution and the Due Course of Law provision of the
Texas Constitution. Maguire contended it was entitled to recover the value of the minerals
in place. 

 As an alternative to its inverse condemnation claim, Maguire alleged it was entitled
to reliance damages it incurred under either a negligent misrepresentation theory, if the
permit was invalid, or under a promissory estoppel theory, if the permit was valid. Maguire
further alleged the City was estopped from denying the validity of the permit. 

 The parties each filed motions for summary judgment. In its motion, the City
contended Maguire's inverse condemnation claim was barred by the statute of limitations. 
It also contended Maguire's reliance on the permit was unreasonable, and thus Maguire
could not prevail on its estoppel theory. In its motion for partial summary judgment,
Maguire contended it should prevail on its inverse condemnation claim as a matter of law. 
The trial court overruled both motions.

 The City later filed a motion to exclude the testimony of one of Maguire's expert
witnesses. The trial court granted the City's motion. The City then filed another motion for
summary judgment and a motion to have the trial court reconsider its previous motion for
summary judgment. 

 In its second motion for summary judgment, the City contended there was no
evidence Maguire suffered economic loss as a result of the City's action and no evidence
the City engaged in selective enforcement of Section 23-102. Further, the City
contended Section 23-102 was rationally related to a legitimate public purpose and
therefore did not discriminate against Maguire. The City also alleged Maguire's negligent
misrepresentation, promissory estoppel, and estoppel claims were barred by sovereign
immunity. After a hearing, the trial court granted the City's motions. 

 Maguire contends the trial court erred in granting summary judgment because (1)
Maguire presented evidence of damages to support its inverse condemnation claim; (2)
Maguire's inverse condemnation claim was not barred by a statute of limitations; (3)
sovereign immunity did not bar Maguire's promissory estoppel and negligent
misrepresentation claims because fact issues existed under a well-settled exception to
sovereign immunity; and (4) Maguire presented evidence to support its selective
enforcement claim.

 The City moved for summary judgment under Tex. R. Civ. P. 166a(b). To prevail
on such a motion, the movant must establish that there is no genuine issue of material fact
and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). 
Summary judgment for a defendant is proper when the defendant negates at least one
element of each of the plaintiff's theories of recovery, or pleads and conclusively
establishes each element of an affirmative defense. Sci. Spectrum, Inc. v. Martinez, 941
S.W.2d 910, 911 (Tex. 1997). When reviewing a summary judgment, we take as true all
evidence favorable to the nonmovant. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223
(Tex. 1999). We indulge every reasonable inference and resolve any doubt in the
nonmovant's favor. Id. On appeal, the movant still bears the burden of showing that there
is no genuine issue of material fact and that the movant is entitled to judgment as a matter
of law. Id.

 Because the City moved for summary judgment in part on the ground the statute of
limitations had run, it must have (1) conclusively proved when the cause of action accrued,
and (2) negated the discovery rule, if it applies and was pleaded or otherwise raised, by
proving as a matter of law there is no genuine issue of material fact about when Maguire
discovered, or in the exercise of reasonable diligence should have discovered, its cause
of action. See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746,
748 (Tex. 1999). If the City established the action was barred by the statute of limitations,
Maguire must then have adduced summary judgment proof raising a fact issue in
avoidance of the statute of limitations. See id.

 The City also moved for a no-evidence summary judgment under Tex. R. Civ. P.
166a(i). When a party moves for a no-evidence summary judgment, that party does not
bear the burden of establishing each element of its own claim or defense, as under Rule
166(a) or (b). Garrett v. L.P. McCuistion Cmty. Hosp., 30 S.W.3d 653, 655 (Tex.
App.-Texarkana 2000, no pet.). Rather, although the nonmoving party is not required to
marshal its proof, that party must present evidence that raises a genuine fact issue on the
challenged elements of the claims on which the nonmovant would have the burden of proof
at trial. Id.

 Because a no-evidence summary judgment is essentially a pretrial directed verdict,
we apply the same legal sufficiency standard as we apply in reviewing a directed verdict. 
Id. We consider all the evidence in the light most favorable to the nonmovant, disregarding
all contrary evidence and inferences. Id. A no-evidence summary judgment is improperly
granted if the nonmovant presents more than a scintilla of probative evidence to raise a
genuine issue of material fact. Id. More than a scintilla of evidence exists when the
evidence rises to a level that would enable reasonable and fair-minded people to differ in
their conclusions. Id.

Inverse Condemnation Claim


 The Fifth Amendment to the United States Constitution provides private property
shall not be taken for public use without just compensation. U.S. Const. amend. V. The
provision is applicable to the states under the Due Process Clause of the Fourteenth
Amendment. U.S. Const. amend. XIV. The Texas Constitution also contains a "takings
clause," which provides in part "[n]o person's property shall be taken, damaged or
destroyed for or applied to public use without adequate compensation being made, unless
by the consent of such person, . . . ." Tex. Const. art. 1, § 17.

 If the government appropriates property without paying adequate compensation, the
owner may recover the resulting damages in an inverse condemnation suit. Westgate, Ltd.
v. State, 843 S.W.2d 448, 452 (Tex. 1992). An inverse condemnation may occur when the
government physically appropriates or invades the property, or when it unreasonably
interferes with the landowner's right to use and enjoy the property, such as by restricting
access or denying a permit for development. Id. To maintain a cause of action for inverse
condemnation, the plaintiff must prove (1) an intentional governmental act, (2) resulting in
the taking, damaging, or destruction of the plaintiff's property, (3) for public use. Gen.
Servs. Comm'n v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001). 

Statute of Limitations

 In its first motion for summary judgment, the City contended the statute of limitations
barred Maguire's inverse condemnation claim. The City's theory is that Section 23-102
was enacted in 1967; therefore, Maguire had to file any inverse condemnation cause of
action within ten years of that date. (4) It cites Trail Enters., Inc. v. City of Houston, 957
S.W.2d 625, 628 (Tex. App.-Houston [14th Dist.] 1997, pet. denied), in which the appellant
asserted an inverse condemnation cause of action after it sought to drill on land within
1,000 feet of Lake Houston. The court of appeals held the cause of action accrued in
1967, the date the ordinance was enacted and, therefore, the date the City first interfered
with the appellant's right to use the property. Id. at 631. The court further held suit had to
be filed within ten years of the date the ordinance was passed. Id. at 631, 633.

 Maguire contends the statute of limitations does not bar its action because Sections
23-101 and 23-102 do not apply. Maguire contends that, at the time the City revoked the
permit, Sections 23-101 and 23-102 prohibited drilling on land in the City's ETJ and 1,000
feet from Lake Houston. The parties do not dispute Maguire's lease is within the Houston
city limits and not in the City's ETJ.

 The summary judgment proof shows the 1967 ordinance prohibited any oil, gas,
liquid hydrocarbon, or any other mineral well from being drilled within "the control area of
Lake Houston which is nearer than 1000 feet from the normal water level of Lake Houston
. . . ." "Control area" was defined in a 1965 ordinance as, "The land around the Lake within
an area five (5) miles in width measured from the Normal Water's Edge of, and within the
watershed of, Lake Houston." A 1977 ordinance redefined the control area as, "That land
contained in the extraterritorial jurisdiction of the City of Houston, Texas, which contains
waters that flow into or adjacent to the watershed of Lake Houston." 

 When construing statutes, our ultimate purpose is to discover the Legislature's
intent. Meritor Auto., Inc. v. Ruan Leasing Co., 44 S.W.3d 86, 89 (Tex. 2001). In
determining that intent, the Legislature has instructed we may consider, among other
things, the object sought to be obtained, the circumstances under which the statute was
enacted, the legislative history, and the consequences of a particular construction. Id.; see
also Tex. Gov't Code Ann. § 311.023 (Vernon 1998). We begin, however, with the words
the Legislature used. Meritor Auto., Inc., 44 S.W.3d at 89. "If the meaning of the statutory
language is unambiguous, we adopt, with few exceptions, the interpretation supported by
the plain meaning of the provision's words and terms." Id., quoting Fitzgerald v. Advanced
Spine Fixation Sys., Inc., 996 S.W.2d 864, 865 (Tex. 1999). These rules apply to the
construction of city ordinances. Mills v. Brown, 159 Tex. 110, 316 S.W.2d 720, 723 (1958);
Rosenblatt v. City of Houston, 31 S.W.3d 399, 403 (Tex. App.-Corpus Christi 2000, pet.
denied), cert. denied, ___ U.S. ___, 121 S.Ct. 2218, 150 L.Ed.2d 211 (2001).

 Standing alone, the language of the ordinance does not support the City's position. 
The 1977 amendment redefined the control area to include only "[t]hat land contained in
the extraterritorial jurisdiction of the City of Houston, Texas, which contains waters that flow
into or adjacent to the watershed of Lake Houston." Maguire's lease is within the city limits
and not in the City's ETJ. Consequently, the ordinance's literal language would not apply
to Maguire's lease.

 The City contends, "If an ordinance is susceptible to two constructions, one being
valid and the other being invalid, the courts will adopt the construction rendering [the]
ordinance valid," quoting Moore v. Cox, 215 S.W.2d 666, 668 (Tex. Civ. App.-Fort Worth
1948, no writ), and citing In re Bay Area Citizens Against Lawsuit Abuse, 982 S.W.2d 371,
380 (Tex. 1998), and Proctor v. Andrews, 972 S.W.2d 729, 735 (Tex. 1998). The City
contends that, if we follow Maguire's interpretation, then landowners in the City's ETJ would
be prohibited from drilling, but adjoining landowners within the city limits would be permitted
to drill. Therefore, similarly situated landowners would be treated differently, making the
ordinance void.

 The City's argument presumes the City had no rational basis to draw that distinction. 
If the City had a rational basis to treat similarly situated landowners differently, a question
we do not address here, then the ordinance would not be void. As Maguire observes, the
City does not have standing to contend one of its own ordinances creates a violation of the
due process or equal protection clauses. Proctor, 972 S.W.2d at 734.

 The City also contends that the ordinance's obvious purpose was to protect Lake
Houston and that any other interpretation would frustrate that purpose. However, it is
conceivable the city council determined it could protect Lake Houston and still allow drilling
within the city limits, but not in the City's ETJ. Our conclusion is bolstered by the fact that,
under the 1977 amendment, not all drilling is prohibited in the City's ETJ, only drilling on
land "which contains waters that flow into or adjacent to the watershed of Lake Houston." 
Presumably, then, drilling could occur on land that is within 1,000 feet of Lake Houston if
the land did not contain "waters that flow into or adjacent to the watershed of Lake
Houston."

 Further, the City's position is at variance with its position in Trail Enterprises. There
the appellant raised an equal protection challenge on the ground that "the Ordinance
requires a small group of mineral interest owners with interests in the control area, which
is in the City's ETJ, to pay the cost of protecting the City's water supply," and that "mineral
owners within the city limits are free to drill within 1000 feet of the lake and its drains
(including man-made), streams, or tributaries regardless of the proximity of the wells to
Lake Houston." Trail Enters., Inc., 957 S.W.2d at 634. The City responded that "the
Ordinance applies equally to all mineral interest owners whose interests are within the
City's ETJ in the Lake Houston control area." Id.

 In addition, the City's position is at variance with subsequent actions of the Houston
city council. Maguire presented summary judgment proof showing that, in 1997, the City
again amended the definition of "control area" to include "[t]hat land either in the city, or
in the extraterritorial jurisdiction of the city, . . . ." The resolution by which the ordinance
was passed recites in part:

 WHEREAS, as a result of recent annexations, a significant portion of
the protected area around Lake Houston formerly in the City's extraterritorial
jurisdiction is now within the City, and it is therefore necessary to amend the
Code of Ordinances to include land within the City in the control area, . . . .


 Finally, the City contends we should give great weight to its construction, as it is
charged with administering and enforcing the ordinance. The City presented the affidavit
of Richard Alexander, a senior inspector for water production for the City and the city
official responsible for enforcing city ordinances in and around Lake Houston. He states
he has always interpreted the prohibition against drilling within 1,000 feet of Lake Houston
as being applicable to land inside the city limits as well as land in its ETJ. In addition, the
City presented the affidavit of Milton Belveal, the City's senior inspector for planning and
development. He states that, other than the permit issued to Maguire, the City has not
issued a drilling permit for an oil, gas, or mineral well located within 1,000 feet of Lake
Houston since 1967. 

 Construction of a statute by an administrative agency charged with its enforcement
is entitled to serious consideration, so long as the construction is reasonable and does not
contradict the plain language of the statute. Tarrant Appraisal Dist. v. Moore, 845 S.W.2d
820, 823 (Tex. 1993). Here, however, the plain language of the ordinance prohibits drilling
only in the City's ETJ. Therefore, we will give no weight to the City's construction of the
ordinance.

 We conclude summary judgment was inappropriate on Maguire's inverse
condemnation cause of action under the theory the statute of limitations had run. We need
not consider Maguire's additional argument the statute of limitations could not have run
because its inverse condemnation cause of action did not accrue until (1) it exhausted all
reasonable alternative means of production of the minerals, or (2) it discovered the only
means available to access the minerals was to drill a well 300 feet from the edge of Lake
Houston.

Economic Loss

 In its second motion for summary judgment, the City contended there was no
evidence Maguire suffered economic loss or damage as a result of the inverse
condemnation. At the heart of the City's contention was its motion to exclude the testimony
of Wayman Gore, one of Maguire's expert witnesses, which the trial court granted, and its
objection to the affidavit of Cary Maguire, which the trial court implicitly sustained when it
granted the City's motion for summary judgment.

 Utilizing geological reports and sample data, Gore estimated there is 47,304,000
mcf of gas present and recoverable under the Maguire lease and the potential value of this
gas is at least $33,586,000.00. He calculated the value of the gas using transactional
values, i.e., what companies pay to purchase proven reserves that are still "in the ground." 
Gore used a transactional value of $0.71 mcf, which an independent service reported was
the median value for the fourth quarter of 1991, the period when the City revoked
Maguire's permit. 

 Gore also calculated the value of the gas using a discounted cash flow analysis. 
This analysis assumed production over time beginning in late 1991. The quantity of gas
assumed produced in each period was multiplied by the price reported in that period and
reduced by the costs associated with drilling. The cash flow in each period was then
discounted to account for the time value of money. Gore concluded the value of these
cash flows discounted to the fourth quarter of 1991 was $42,377,000.00. 

 Gore admitted he had no opinion concerning the price a willing buyer would pay a
willing seller for the gas. In fact, he expressed doubt that a willing buyer would pay
$33,586,000.00 for the mineral prospect. Rather, he characterized his calculation as the
fair market value to Maguire of drilling the well, producing the gas, and selling it. 

 In his affidavit, Cary Maguire stated that, in his opinion, the fair market value of
Maguire's mineral interest was at least $36,000,000.00. He based his opinion on his over
forty-seven years' experience as an independent oil and gas producer and on his position
as a working interest owner. He also based his opinion on Gore's calculations and
methodologies. 

 When a government condemns real property, the normal measure of damages is
the land's market value. City of Harlingen v. Estate of Sharboneau, 48 S.W.3d 177, 182
(Tex. 2001). Market value is the price the property will bring when offered for sale by one
who desires to sell, but is not obliged to sell, and bought by one who desires to buy, but
is under no necessity of buying. Id.

 The City sought to exclude Gore's testimony on the ground he used a faulty
methodology to calculate economic loss resulting from the taking. The City contends
Gore's opinion was irrelevant because it was not based on an estimate of the market value
of what was taken, i.e., the right to drill for gas, and speculative because it presumes
minerals are present under the Maguire lease and can be recovered. Because Cary
Maguire based his opinion, in part, on Gore's methodologies and calculations, the City
contended his opinion evidence suffered from the same deficiencies as Gore's.

 Maguire contends that the appropriate measure of damages is the value of the
minerals in place and that it could properly introduce expert testimony to establish the
value. Maguire relies on several cases to support its theory. In State v. Angerman, 664
S.W.2d 794, 796 (Tex. App.-Waco 1984, writ ref'd n.r.e.), the court of appeals held it was
not error to allow an expert to testify about the amount of gravel on the land and the value
of that gravel as a basis for his opinion of the market value of the land. In Coastal Indus.
Water Auth. v. Trinity Portland Cement Div., 523 S.W.2d 462, 468 (Tex. Civ. App.-Houston
[1st Dist.] 1975, writ ref'd n.r.e.), the court of appeals held that, as a means of determining
the value of condemned land, an expert could testify as to the amount of clay in place and
the market value per unit, and calculate the total value of the clay in place by multiplying
the quantity by the price. In Brazos River Auth. v. Gilliam, 429 S.W.2d 949, 952-53 (Tex.
Civ. App.-Fort Worth 1968, writ ref'd n.r.e.), the expert determined the value of the sand
and gravel using data from three sales of gravel in place on other nearby tracts and used
"a mathematical formula" to determine the value of the sand and gravel in place. In Brazos
River Conservation & Reclamation Dist. v. Costello, 169 S.W.2d 977, 988 (Tex. Civ.
App.-Eastland 1943, writ ref'd w.o.m.), the court of appeals held an expert could testify
about the value of oil reserves under condemned property.

 These cases are arguably distinguishable, either because the court was only
concerned with the value of the minerals as an aid to determining the value of the land
(Angerman, Coastal Industries, and Gilliam), because the minerals at issue involved less
uncertainty in their extraction than oil and gas (Angerman, Coastal Industries, and Gilliam),
and/or because the oil and gas condemned was from producing fields (Costello). (5)

 However, in Lomax v. Henderson, 559 S.W.2d 466, 466 (Tex. Civ. App.-Waco
1977, writ ref'd n.r.e.), the Brazos River Authority condemned 200 acres, of which the
appellees owned the surface and an undivided mineral interest and the appellants owned
an undivided one-fourth mineral interest in sixty-four acres. The Authority's statement of
condemnation expressly reserved the mineral interests to the defendants, but stipulated
"no operations for the recovery of any such oil, gas, and other minerals shall be conducted
on the surface of said premises." Id. Yet there was no indication production of oil, gas,
or other minerals was ongoing at the time the land was condemned. See id. at 467-68.

 After the trial court rendered judgment, the appellees sought to withdraw the
damage award from the court registry, asserting they were entitled to the full amount of
damages because they owned the surface and the mineral interests were not condemned. 
Id. at 467. The appellants intervened, contending their mineral interests were rendered
valueless by the restrictions on surface use. Id.

 The court of appeals wrote, "Without question, appellants' right of use of the surface
of the land in question was taken from them. The proper measure of this loss, and the one
sought to be shown by appellants on the trial, was the diminution of value of their mineral
estate by the taking." Id. (emphasis added). Though there is language in the court's
opinion suggesting the testimony centered around the value of the minerals in the ground,
the overall thrust of the majority opinion and the dissenting opinion makes clear that the
issue was the value of the mineral estate as a whole. See id. at 470 (James, J.,
dissenting) ("Appellants' second . . . point of error asserts the trial court erred in finding that
Appellants' mineral rights had no market value, and that such finding is so against the great
weight and preponderance of the evidence as to be manifestly unjust. I would sustain this
contention.").

 The Texas Supreme Court has acknowledged the primacy of comparable sales
evidence to determine the market value of property taken. Estate of Sharboneau, 48
S.W.3d at 182. However, the court also acknowledged that, when comparable sales
figures are lacking or the method is otherwise inadequate as a measure of fair market
value, other methods of determining market value can be applied. Id. at 183. Whatever
method an expert uses, however, "the goal of the inquiry is always to find the fair market
value of the condemned property. An appraisal method is only valid if it produces an
amount that a willing buyer would actually pay to a willing seller." Id.

 Federal courts have accepted evidence of comparable sales of mineral interests to
establish the value of a mineral interest taken. See Cal-Bay Corp. v. United States, 169
F.2d 15, 24 (9th Cir. 1948); see also St. Genevieve Gas Co. v. Tennessee Valley Auth.,
747 F.2d 1411, 1414 (11th Cir. 1984) (trial court's finding other mineral leases were not
comparable to mineral leases at issue was not clearly erroneous); United States v. 179.26
Acres of Land, 644 F.2d 367, 371 (10th Cir. 1981) ("The best evidence of market value of
real property in condemnation is, of course, found in sales of comparable land within a
reasonable time before the taking."). Where evidence of comparable sales of mineral
interests does not exist, however, federal courts have approved other valuation methods
to determine the economic loss resulting from a taking. See 179.26 Acres of Land, 644
F.2d at 372. One federal court approved the use of a method very similar to the one Gore
applied in the present case. United States v. 2,847.58 Acres of Land, 529 F.2d 682, 685
(6th Cir. 1976) ("The witness Nosow emphasized the fact that he was not giving the value
of the oil if it were produced and brought to the surface, but was testifying to what a willing
buyer would pay and a willing seller would take for these mineral reserves in place."). 
Other federal courts have used an income capitalization approach, which measures the
present value of the income the estimated recoverable minerals could generate in a proven
market, reduced by the cost to recover the minerals and an appropriate risk factor. See
United States v. 2,560.00 Acres of Land, 836 F.2d 498, 503-04 (10th Cir. 1988); United
States v. 103.38 Acres of Land, 660 F.2d 208, 212 (6th Cir. 1981); United States v.
Whitehurst, 337 F.2d 765, 776 (4th Cir. 1964).

 From this standpoint, Gore's affidavit provided some evidence of market value. The
City makes much of excerpts from Gore's deposition and his affidavits where he states he
calculated the fair market value of the gas "to Maguire." However, Gore calculated the
value of the gas by using transactional values reported for the fourth quarter of 1991. He
explained that these transactional values are what companies pay to purchase reserves
still "in the ground." In short, his method measures comparable sales of "proven" reserves.

 The City contends the reserves beneath Maguire's lease are not "proven" and
therefore Gore's affidavit was speculative because it was based on the assumption there
was gas present and recoverable. The City maintains sales of comparable mineral
interests would provide better evidence of market value.

 However, Maguire presented sufficient summary judgment proof to raise a fact
question regarding the existence and recoverability of gas on its lease. We agree evidence
of comparable sales of mineral interests would provide a superior measure of market
value, given that the existence of recoverable gas under Maguire's lease is as yet
unproven. Nevertheless, Maguire's summary judgment proof is not deficient merely
because it failed to provide such evidence. If competent comparable sales evidence
exists, the parties will have the opportunity to present it at trial and the court must admit it
to the exclusion of any other valuation evidence. In the absence of such evidence, Gore's
affidavit provides summary judgment proof of market value. In addition, even if Gore's
method of measuring the value of the minerals in place did not provide an adequate
measure of market value, his use of a discounted cash flow analysis provided some proof
of market value in the absence of comparable sales evidence. See Estate of Sharboneau,
48 S.W.3d at 183 (approving use of income capitalization method).

 Therefore, summary judgment was inappropriate on Maguire's inverse
condemnation claim. We need not address Maguire's contention that Cary Maguire's
affidavit also presents competent evidence of economic loss.

Negligent Misrepresentation and Promissory Estoppel Claims


 As an alternative to its inverse condemnation claim, Maguire alleged it was entitled
to reliance damages it incurred under either a negligent misrepresentation theory, if the
permit was invalid, or under a promissory estoppel theory, if the permit was valid. While
denying Maguire's negligent misrepresentation and promissory estoppel claims, the City
moved for summary judgment under the doctrine of sovereign immunity.

 A city is immune from liability for its governmental actions unless that immunity is
waived. City of LaPorte v. Barfield, 898 S.W.2d 288, 291 (Tex. 1995). Operation of a
reservoir has been classified a governmental function for which a municipality is immune
from suit except where immunity has been waived under the Texas Tort Claims Act. Tex.
Civ. Prac. & Rem. Code Ann. § 101.0215(a)(19) (Vernon Supp. 2002); see also Tex. Civ.
Prac. & Rem. Code Ann. § 101.021 (Vernon 1997). Also, the issuance and denial of
permits has been held to be a governmental function. See Trevino & Gonzalez Co. v. R. F.
Muller Co., 949 S.W.2d 39, 42 (Tex. App.-San Antonio 1997, no writ); Kirschke v. City of
Houston, 330 S.W.2d 629, 633 (Tex. Civ. App.-Houston 1959, writ ref'd n.r.e.)
(development permit), overruled on other grounds, City of Austin v. Teague, 570 S.W.2d
389, 393 (Tex. 1978).

 Maguire contends the City is estopped from invoking sovereign immunity. The
general rule is that, when a municipality or other unit of government is exercising its
governmental powers, it is not subject to estoppel. City of Hutchins v. Prasifka, 450
S.W.2d 829, 835 (Tex. 1970). However, a municipality may be estopped in those cases
where justice requires the application of estoppel and there is no interference with the
exercise of its governmental functions. Id. at 836, citing City of Dallas v. Rosenthal, 239
S.W.2d 636 (Tex. Civ. App.-Dallas 1951, writ ref'd n.r.e.). This exception is to be applied
with caution and only in exceptional cases where the circumstances clearly demand its
application. Id.

 In Rosenthal, the city ordered the appellee to stop using his property as a meat
storage facility in violation of city zoning ordinances, even though the city had issued two
permits in a year and a half, visited the appellee's property multiple times, and the appellee
had expended substantial funds. See Rosenthal v. City of Dallas, 211 S.W.2d 279, 282,
291-92 (Tex. Civ. App.-Dallas 1948, writ ref'd n.r.e.) (hereinafter, Rosenthal I). Initially, the
court of appeals affirmed the trial court's judgment in favor of the city, but on rehearing
reversed the judgment and sent the case back for a new trial. (6) Id. at 288, 294-95. At the
end of the second trial, the trial court enjoined the city from enforcing the zoning ordinance. 
City of Dallas v. Rosenthal, 239 S.W.2d at 637 (hereinafter, Rosenthal II). In affirming the
trial court's judgment, the court of appeals held, "In exceptional cases (and surely this is
one), a municipality, even in exercise of a governmental function, may be subjected to the
same rules of equitable estoppel as are individuals where right and justice require it." Id.
at 645.

 The Rosenthal cases are part of a line of cases applying or, in most cases, refusing
to apply estoppel in the context of permitting and zoning actions. See John M. Black &
Josiah M. Daniel, III, The Texas Rule of Estoppel in Zoning Cases, 33 Baylor L. Rev. 241,
247 (1981); David Hartman, Comment, Risky Business: Vested Real Property
Development Rights - The Texas Experience and Proposals for the Texas Legislature to
Improve Certainty in the Law, 30 Tex. Tech. L. Rev. 297, 309 (1999). For instance, in City
of Amarillo v. Stapf, 129 Tex. 81, 101 S.W.2d 229, 232 (1937), and Davis v. City of
Abilene, 250 S.W.2d 685, 688 (Tex. Civ. App.-Eastland 1952, writ ref'd), the courts held
the unauthorized acts of city officials in wrongfully issuing permits to landowners could not
estop the cities from enforcing their zoning ordinances. See also Black & Daniel, supra,
at 244 n.12 (and cases cited therein).

 In Rosenthal, by contrast, the court held the building inspector was lawfully charged
with determining whether the meat storage facility qualified as a permissible nonconforming
use. Rosenthal II, 239 S.W.2d at 643; Rosenthal I, 211 S.W.2d at 291. The city did not
appeal the building inspector's determination in favor of the landowner; therefore, city
officials acted on appropriate authority in issuing the permit and the city was estopped from
repudiating it. Rosenthal II, 239 S.W.2d at 645; Rosenthal I, 211 S.W.2d at 291.

 The City contends Rosenthal is not a common-law exception to sovereign immunity
because Rosenthal did not involve sovereign immunity. Rather, the landowner used
estoppel as a defense to the city's action in enforcement of its zoning ordinance. Further,
the City contends Rosenthal's holding would apply only if the City was seeking equitable
relief, citing Marriott v. City of Dallas, 635 S.W.2d 561, 564 (Tex. App.-Dallas 1982), aff'd,
644 S.W.2d 469 (Tex. 1983). In Marriott, the court viewed Rosenthal as being "squarely
bottom[ed] . . . upon the premise that the city, seeking equity, must show it had done
equity." Id.

 The City's contention ignores the fact that, when faced with the City's stop work
order, Maguire stopped working, thereby obviating the City's need to seek equitable relief. 
Though the Rosenthal court was clearly concerned with balancing the equities between the
parties, in part because the city sought injunctive relief, the court's broader holding was that
a city may be equitably estopped in exceptional cases where justice requires it. 
Rosenthal I, 239 S.W.2d at 645. We see no reason for applying this rule only when the
city is seeking equitable relief.

 Further, while Rosenthal did not technically involve an assertion of sovereign
immunity, it did involve the principle that, when a city is exercising its governmental powers,
it is not subject to estoppel. See Prasifka, 450 S.W.2d at 835. This principle is similar, if
not identical, to the principle underlying sovereign immunity. See City of San Angelo v.
Deutsch, 126 Tex. 532, 91 S.W.2d 308, 310 (1936) ("The cases in which questions of
[immunity from] liability are presented are the same in their general nature and in the
reasons underlying their decision as are those in which estoppel is invoked."); Dillard v.
Austin Indep. Sch. Dist., 806 S.W.2d 589, 594 (Tex. App.-Austin 1991, writ denied) (calling
bar against invoking estoppel on city acting in its governmental capacity a corollary to
sovereign immunity); see also Black & Daniel, supra, at 243 (stating because sovereign
immunity tends to insulate city from negligent acts associated with zoning, Texas courts
are reluctant to uphold estoppel against city's enforcement of zoning ordinances).

 The caselaw suggests that in order to apply estoppel the trial court must determine
the following:

 (1) whether the landowner is relying on an authorized act of a city official or
employee, see Stapf, 101 S.W.2d at 232; Deutsch, 91 S.W.2d at 310; Krause v.
City of El Paso, 101 Tex. 211, 106 S.W. 121, 123 (1907) (holding landowner entitled
to rely on permit from mayor and survey of city engineer, both of which city
ordinance required her to obtain before building); Rosenthal II, 239 S.W.2d at 643
(holding building inspector's decision was one he was empowered to make);
Rosenthal I, 211 S.W.2d at 291 (same); see also Black & Daniel, supra, at 241;


 (2) whether this is the kind of case in which justice requires the application of
estoppel, see Prasifka, 450 S.W.2d at 836; Arrington v. County of Dallas, 792
S.W.2d 468, 472 (Tex. App.-Dallas 1990, writ denied) (upholding summary
judgment because circumstances not "so grave as to constitute manifest injustice");
and


 (3) whether the application of estoppel would interfere with the exercise of the
city's governmental functions, see Prasifka, 450 S.W.2d at 836.


 Further, relevant authorities suggest a party seeking to invoke estoppel against a
city must demonstrate he or she qualifies under each element of equitable estoppel. See
City of Lufkin v. McVicker, 510 S.W.2d 141, 145 (Tex. Civ. App.-Beaumont 1973, writ ref'd
n.r.e.); see also Black & Daniel, supra, at 242. In McVicker, the court of appeals stated the
landowner failed to meet any of the elements of equitable estoppel, i.e., 

 a false representation or concealment of material facts; it must have been
made with knowledge, actual or constructive of the facts; the party to whom
it was made must have been without knowledge or the means of knowledge
of the real facts; it must have been made with the intention that it should be
acted on; and the party to whom it was made must have relied on or acted
on it to his prejudice.

 

McVicker, 510 S.W.2d at 145, quoting Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929,
932 (1952). These are normally questions for the jury, but may be established (or refuted)
as a matter of law by undisputed evidence. Jones v. Ray Ins. Agency, 59 S.W.3d 739, 752
(Tex. App.-Corpus Christi 2001, no pet. h.); Page Airways, Inc. v. Associated Radio Serv.
Co., 545 S.W.2d 184, 192 (Tex. Civ. App.-San Antonio 1976, writ ref'd n.r.e.); see also
Upchurch v. Albear, 5 S.W.3d 274, 277 (Tex. App.-Amarillo 1999, pet. denied); 4M Linen
& Uniform Supply Co. v. W. P. Ballard & Co., 793 S.W.2d 320, 322 (Tex. App.-Houston
[1st Dist.] 1990, writ denied).

 Though we agree the elements of equitable estoppel must be present, we note the
equitable estoppel recognized in Rosenthal was based on the city's conduct. (7) The building
inspector classified the meat storage facility as a permissible nonconforming use, the city
did not appeal his decision, and the court estopped the city from later enforcing the
ordinance. Rosenthal II, 239 S.W.2d at 643; Rosenthal I, 211 S.W.2d at 291. One who
by his conduct has induced another to act in a particular manner should not be permitted
to adopt an inconsistent position and thereby cause loss or injury to the other. Fabrique,
Inc. v. Corman, 796 S.W.2d 790, 792 (Tex. App.-Dallas 1990), writ denied, 806 S.W.2d
801 (Tex. 1991) (per curiam); Mobil Oil Corp. v. Frederick, 615 S.W.2d 323, 325 (Tex. Civ.
App.-Fort Worth), aff'd in part & rev'd in part on other grounds, 621 S.W.2d 595 (Tex.
1981); see also 31 C.J.S. Estoppel and Waiver § 59 (1996). In equitable estoppel by
conduct, the fraud is the inconsistent position subsequently taken, rather than the original
conduct. 28 Am. Jur. 2d Estoppel and Waiver § 71 (2000).

 In the present case, we conclude the City failed to establish grounds for avoidance
of estoppel as a matter of law. Maguire presented sufficient summary judgment proof to
show the actions of city officials were authorized. We have already stated that the
language of Section 23-102 does not prohibit Maguire from drilling. (8) City officials issued
Maguire three drilling permits, and the City does not contend Maguire failed to fulfill the
formal requirements for obtaining these permits. Further, Alexander's affidavit asserts that
he is "a City official responsible for enforcing City ordinances in and around Lake Houston,"
that he issued the stop work order, and that he revoked the permit. Therefore, the City
failed to demonstrate, as a matter of law, its officials were not acting under the City's
authority.

 In addition, Maguire demonstrated this is the kind of case in which justice requires
application of estoppel. Maguire presented summary judgment proof that, after obtaining
the permits, it expended $190,000.00 preparing the drill site, including clearing a wooded
area, building a road, driving pipe, and reinforcing a bridge. 

 Also, estoppel would not interfere with the City's exercise of its governmental
functions. Though we have found no case applying the Texas Supreme Court's language
from Prasifka, dicta from Dallas County Flood Control Dist. No. 1 v. Cross, 815 S.W.2d
271, 284 (Tex. App.-Dallas 1991, writ denied), suggests estoppel would interfere with the
exercise of a city's governmental functions if it would erect a legal barrier to the city
carrying out its governmental functions in the future. On the other hand, estoppel would
not interfere with the exercise of a city's governmental functions if the landowner had been
using the land for some time without objection from the city. See Krause, 106 S.W. at 123
(landowner's house stood on property for over twenty years before city enforced boundary);
Rosenthal I, 211 S.W.2d 279 (landowner used property as meat storage facility for year
and a half before city sought to enforce zoning law). We do not suggest these are the only
factors a trial court could properly consider in making this determination.

 In the present case, Maguire sought damages associated with its expenditures to
prepare the drill site. Monetary damages would not prevent the City from operating Lake
Houston in the future or place the City's drinking water at risk. In fact, assuming Maguire's
well would threaten the City's drinking water, money damages are a superior remedy to
enforcement of the permit. However, even if Maguire had sought the removal of the City's
stop work order, summary judgment would still have been inappropriate, because Maguire
presented summary judgment proof of other wells that have been drilled within 1,000 feet
of Lake Houston.

 Finally, Maguire's summary judgment proof raises a fact issue concerning each
element of equitable estoppel. Maguire's summary judgment proof establishes that the
City issued Maguire three permits, that Maguire relied on the City's conduct in issuing the
permits by expending substantial funds, and that, later, city officials revoked the permit and
issued Maguire a stop work order. Therefore, the City failed to refute Maguire's estoppel
defense. Summary judgment was inappropriate on Maguire's claims for negligent
misrepresentation and promissory estoppel based on sovereign immunity.

 The City also contends that, notwithstanding the availability of sovereign immunity,
Maguire's negligent misrepresentation and promissory estoppel claims fail as a matter of
law. The elements of negligent misrepresentation are: (1) a defendant makes a
representation in the course of business or a transaction in which the defendant has a
pecuniary interest; (2) the defendant supplies "false information" for the guidance of others
in their business; (3) the defendant did not exercise reasonable care or competence in
obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by
justifiably relying on the representation. Fed. Land Bank Ass'n of Tyler v. Sloane, 825
S.W.2d 439, 442 (Tex. 1991); Facciolla v. Linbeck Constr. Corp., 968 S.W.2d 435, 442
(Tex. App.-Texarkana 1998, no pet.). The City contends any alleged misrepresentation
had to occur in the course of a business or pecuniary transaction and the issuance of a
drilling permit is not a business transaction.

 However, we have already concluded that the language of Section 23-102 does not
prohibit Maguire from drilling and that the City has not alleged Maguire failed to comply with
the formalities for obtaining a permit; therefore, the permit was valid. Summary judgment
was appropriate on Maguire's negligent misrepresentation claim.

 The elements of promissory estoppel include: (1) a promise; (2) foreseeability of
reliance by the promisor; and (3) substantial reliance by the promisee to his detriment. 
English v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983). Maguire's promissory estoppel claim
is based on the permit, which it contended induced it to expend substantial funds to
prepare the site for drilling. The City contends a permit is not a promise.

 In Shelby Operating Co. v. City of Waskom, 964 S.W.2d 75, 80 (Tex.
App.-Texarkana 1997, pet. denied), this Court held, 

 If the ordinance requires that a drilling permit be obtained before a well is
commenced and also prescribes the conditions which must be met, the
granting of a permit is a ministerial act and is not discretionary. Accordingly,
if the provisions of the ordinance are met, the permit must be issued and
cannot be revoked,

 

citing 5 Eugene Kuntz, Oil and Gas § 68.3 (1991). See also Ex parte Mata, 925 S.W.2d
292, 295 (Tex. App.-Corpus Christi 1996, no writ) ("The granting of licenses and permits
are generally held to be privileges and not rights, although if one meets the criteria set in
order to obtain a permit or license, it may not be lawfully refused. It becomes a right."). 
Our language in Shelby regarding revocation of a permit must be limited when there is
language in the ordinance itself governing the terms of revocation or when city officials,
acting under the city's inherent police powers, determine drilling is endangering the public
health, morals, safety, or welfare. See Trevino & Gonzalez Co., 949 S.W.2d at 42, citing
Leach v. Coleman, 188 S.W.2d 220, 224-25 (Tex. Civ. App.-Austin 1945, writ ref'd w.o.m.),
and Tex. Transp. Code Ann. § 316.004 (Vernon 1999) (empowering cities to include "a
provision that authorizes the governing body, at its discretion, to terminate the permit
without notice to the permit holder" in an ordinance establishing permit program).

 The City cites the court's statement in Trevino that, "A building permit is simply a
revocable and alterable license authorizing construction." Trevino & Gonzalez Co., 949
S.W.2d at 42. That statement was made in the context of the court's holding that a permit
is not a contract. Id. However, promissory estoppel applies when a promise is not
enforceable in contract. 31 C.J.S. Estoppel and Waiver § 92 (1996).

 In the present case, the City issued Maguire three permits, which vested it with the
right to drill. That right was not revocable except under the terms of the ordinance or if city
officials determined Maguire's drilling was affecting the public health and safety. As such,
it was a promise to allow Maguire to drill under the terms of the governing ordinances so
long as its activities did not endanger the public welfare. There is no summary judgment
proof showing under what conditions a drilling permit may be revoked under the Houston
Code of Ordinances. There is also no summary judgment proof showing Maguire's
activities were a threat to the public welfare. In fact, Maguire's summary judgment proof
shows the existence of other wells located the same distance from Lake Houston as
Maguire's lease. Therefore, summary judgment was inappropriate on Maguire's
promissory estoppel claim.

Selective Enforcement Claim


 Maguire next contends the trial court erred by rendering a no-evidence summary
judgment against its selective enforcement claim. As a general rule, an ordinance is not
rendered either invalid or inoperative by the failure of officials to enforce it on other
occasions. (9) McVicker, 510 S.W.2d at 145; see also T & R Assocs. v. City of Amarillo, 688
S.W.2d 622, 630 (Tex. App.-Amarillo 1985, writ ref'd n.r.e.) ("The fact that a city official or
employee fails in certain particulars to enforce a zoning regulation cannot render it
invalid."). Maguire contends, however, Section 23-102 has been discriminatorily applied. (10) 

 The City contends that, because Maguire did not make a showing it was part of a
protected class, it cannot recover. The City's position is based on a series of decisions
culminating in State v. Malone Serv. Co., 829 S.W.2d 763 (Tex. 1992). In that case, the
Texas Supreme Court held that, to establish a claim of discriminatory enforcement, a party
must first show he or she has been singled out for prosecution or enforcement of the
regulation or ordinance while others similarly situated and committing the same acts have
not. Id. at 766; see also United States v. Rice, 659 F.2d 524, 526 (5th Cir. 1981); Wolf v.
State, 661 S.W.2d 765, 766 (Tex. App.-Fort Worth 1983, writ ref'd n.r.e.). Further, the
party must also show the government has purposefully discriminated on the basis of an
impermissible consideration such as race, religion, or the desire to prevent the exercise of
constitutional rights. Malone Serv. Co., 829 S.W.2d at 766; see Rice, 659 F.2d at 526;
Wolf, 661 S.W.2d at 766.

 Both Malone Service Company and Rice involved claims not raised by specially
protected groups. Malone Service Company involved a claim by a hazardous waste
disposal plant operator about enforcement of an environmental regulation, Malone Serv.
Co., 829 S.W.2d at 765; Rice involved a claim the Internal Revenue Service was
selectively enforcing the tax code against a group of tax protesters because of their
exercise of their right to protest. Rice, 659 F.2d at 526. Both the Texas Supreme Court
in Malone Service Company and the Fifth Circuit in Rice concluded the defendants failed
to show the government had an invidious motivation for enforcing the law (e.g., one based
on race, ethnicity, religion, gender, or the desire to prevent the exercise of constitutional
rights). Rice, 659 F.2d at 527; Malone Serv. Co., 829 S.W.2d at 767.

 The City contends Maguire has not shown it is in a protected group and, therefore,
it is not entitled to raise an equal protection argument. The United States Supreme Court
recently addressed a situation where a municipality refused to connect a water line to the
plaintiff's property unless the plaintiff granted it a thirty-three-foot easement, rather than the
fifteen-foot easement required of her neighbors. Vill. of Willowbrook v. Olech, 528 U.S.
562, 563, 120 S.Ct. 1073, 145 L.Ed.2d 1060, 1062 (2000). The Court, reiterating earlier
cases, recognized a cognizable equal protection claim brought by a "class of one," where
the plaintiff alleges that he or she has been intentionally treated differently from others
similarly situated and that there is no rational basis for the difference in treatment. Id., 528
U.S. at 564, citing Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38
S.Ct. 495, 62 L.Ed. 1154, 1155-56 (1918). In Sunday Lake Iron, the Court wrote:

 The purpose of the equal protection clause of the Fourteenth
Amendment is to secure every person within the State's jurisdiction against
intentional and arbitrary discrimination, whether occasioned by express terms
of a statute or by its improper execution through duly constituted agents . . . .
It is also clear that mere errors of judgment by officials will not support a
claim of discrimination. There must be something more - something which
in effect amounts to an intentional violation of the essential principle of
practical uniformity. The good faith of such officers and the validity of their
actions are presumed; when assailed, the burden of proof is upon the
complaining party.


Sunday Lake Iron Co., 247 U.S. at 352-53 (citation omitted).

 Olech teaches that a party may be able to maintain an equal protection claim, even
though he or she does not belong to a protected class. At a summary judgment hearing,
a party must present some evidence that he or she was intentionally treated differently than
others who are similarly situated and that there is no rational basis for the differential
treatment. See Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 500 (2d Cir. 2001);
Am. Fabricare v. Township of Falls, 101 F.Supp.2d 301, 309 n.14 (E.D. Pa. 2000).

 After Olech, the federal courts have grappled with the role of the defendant's motive
in "class of one" equal protection cases. In Hilton v. City of Wheeling, 209 F.3d 1005, 1008
(7th Cir. 2000), the Seventh Circuit stated "the role of motive is left unclear" in Olech and
held the United States Supreme Court's requirement the plaintiff prove there is no rational
basis for the differential treatment means the plaintiff must demonstrate "the defendant
deliberately sought to deprive [the plaintiff] of the equal protection of the laws for reasons
of a personal nature unrelated to the duties of the defendant's position." See also Bartell
v. Aurora Pub. Sch., 263 F.3d 1143, 1149 (10th Cir. 2001) (taking a similar position); Shipp
v. McMahon, 234 F.3d 907, 915 (5th Cir. 2000) (same). However, in Olech, the United
States Supreme Court held the plaintiff's complaint, which alleged the defendant
intentionally demanded an "irrational and wholly arbitrary" thirty-three-foot easement, but
later settled for a "clearly adequate" fifteen-foot easement, was sufficient to state a claim
for relief "quite apart from the Village's subjective motivation." Olech, 528 U.S. at 565.

 Regardless of whether a plaintiff must prove the differential treatment was motivated
by animus, we conclude Maguire presented sufficient summary judgment proof to raise a
fact issue on its equal protection claim. Maguire offered the affidavit of James D. Wilson,
who stated he reviewed topographical maps of the area and Texas Railroad Commission
documents and discovered twenty-one wells "drilled after 1967, inside the city limits of
Houston, and within 1000 feet of Lake Houston's drains, streams or tributaries." He also
stated he was able to visually confirm the location of six of these wells. Of the twenty-one
wells, all but four are operated by a single company. 

 This proof, though admittedly circumstantial, is sufficient to raise a fact question
concerning whether the City intentionally enforced Section 23-102 against Maguire
differently than against other companies. Further, because the other wells are similarly
situated to the one Maguire sought to drill, the summary judgment proof is sufficient to
raise a fact issue concerning whether the City had a rational basis for enforcing Section
23-102 differently. Finally, assuming Maguire is required to prove the City acted with
animus, the summary judgment proof is sufficient to raise a fact issue because the proof
shows the differential enforcement disproportionately favors a single company. Therefore,
summary judgment was inappropriate on Maguire's selective enforcement cause of action.

Conclusion


 Summary judgment was appropriate on Maguire's negligent misrepresentation
claim. However, summary judgment was inappropriate on Maguire's inverse condemnation
claim, its claim for reliance damages based on promissory estoppel, and its selective
enforcement claim. Therefore, we affirm the trial court's judgment in part, reverse in part,
and remand for further proceedings.



 Donald R. Ross

 Justice


Date Submitted: August 28, 2002

Date Decided: February 15, 2002


Publish

1. A full list of plaintiffs is as follows: (1) Maguire Oil Company; (2) Maguire Energy
Company; (3) Cary M. Maguire, individually; (4) Cary M. Maguire as manager for the Oil
Fund, a Texas joint venture; (5) Cary M. Maguire as trustee of the Cary M. Maguire, Jr.,
Melinda Ambler Maguire, and Ann Blaine Maguire trusts; (6) Don R. Holloway as custodian
of property for W. Matthew Holloway, Barbara Ann Holloway, and Tillman R. Holloway
under the Texas Uniform Transfers to Minors Act (TUTTMA), see Tex. Prop. Code Ann.
§§ 141.001-.025 (Vernon Supp. 2002); and (7) William N. Collins as custodian of property
for L. Paige Collins, Hattie S. Collins, and Chandler Collins under the TUTTMA. Each of
the plaintiffs (except Cary M. Maguire as trustee) is either a working interest holder in, or
a royalty owner and lessor of, one or more of the oil, gas, and mineral leases the subject
of this suit. 
2. The Texas Local Government Code defines extraterritorial jurisdiction as the
unincorporated area that is contiguous to the corporate boundaries of the city and that is
located within five miles of those boundaries if the city has 100,000 or more inhabitants. 
Tex. Loc. Gov't Code Ann. § 42.021(5) (Vernon 1999).
3. Maguire abandoned its discrimination claim at the hearing on the City's second
motion for summary judgment.
4. There is no specific statute of limitations for an inverse condemnation claim. 
However, courts have held the ten-year statute of limitations to acquire land by adverse
possession applies. Trail Enters., Inc. v. City of Houston, 957 S.W.2d 625, 631 (Tex.
App.-Houston [14th Dist.] 1997, pet. denied); see also Tex. Civ. Prac. & Rem. Code Ann.
§ 16.026(a) (Vernon Supp. 2002); Brazos River Auth. v. City of Graham, 163 Tex. 167, 354
S.W.2d 99, 110 (1961); Waddy v. City of Houston, 834 S.W.2d 97, 102 (Tex.
App.-Houston [1st Dist.] 1992, writ denied); Hudson v. Arkansas Louisiana Gas Co., 626
S.W.2d 561, 563 (Tex. App.-Texarkana 1981, writ ref'd n.r.e.); Hubler v. City of Corpus
Christi, 564 S.W.2d 816, 823 (Tex. Civ. App.-Corpus Christi 1978, writ ref'd n.r.e.).
5. Maguire also relies on dicta from Haupt, Inc. v. Tarrant County Water Control &
Improvement Dist. Number One, 833 S.W.2d 697, 699-700 (Tex. App.-Waco 1992), rev'd
on other grounds, 854 S.W.2d 909 (Tex. 1993), in which expert testimony was introduced
to establish the value of minerals in place on condemned land. However, Haupt does not
provide sufficient insight into the methods the expert witness used to value the minerals. 
For example, did the expert use sales of comparable mineral interests, a discounted cash
flow analysis of the revenues that could be earned from the minerals, or as Maguire
attempted to do in this case, sales of the reserves in the ground? In addition, Haupt dealt
with "proven" reserves from producing fields. Other cases we have reviewed suffer from
these same deficiencies. See Tarrant County Water Control & Improvement Dist. Number
One v. Fullwood, 963 S.W.2d 60, 61 (Tex. 1998) (Hecht, J., dissenting from denial of
application for writ of error) ("[T]he [trial] court awarded Fullwood $60,000 for what the jury
found to be the value of his royalty interest at the time the District plugged the wells, based
on the anticipated future economic productive life of the oil reserves."); Trinity River Auth.
v. Chain, 437 S.W.2d 887, 889 (Tex. Civ. App.-Beaumont 1969, writ ref'd n.r.e.) (where
jury was asked to determine "reasonable market value of the minerals under the 280.64
acres of land being condemned"); City of Teague v. Stiles, 263 S.W.2d 623, 628, 630 (Tex.
Civ. App.-Waco 1953, writ ref'd n.r.e.) (holding witness competent to testify "as to the
market value of the royalty under the land; that the value of the royalty under the lake
would be depreciated; and that the spacing rule of the Railroad Commission is one well per
40 acres").
6. In fact, Justice Looney dissented on rehearing and Chief Justice Bond concurred,
making the opinion on original submission the dissenting opinion and the dissenting
opinion on rehearing the majority opinion. See Rosenthal v. City of Dallas, 211 S.W.2d
279, 294-95 (Tex. Civ. App.-Dallas 1948, writ ref'd n.r.e.) (Bond, C.J., concurring on reh'g).
7. The estoppel doctrine applied in Rosenthal is also closely akin to quasi-estoppel,
which is a species of equitable estoppel and is itself an equitable doctrine. See Cook
Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 136 (Tex. App.-Houston
[14th Dist.] 2000, pet. dism'd); 31 C.J.S. Estoppel and Waiver § 120 (1996); see also 31
id. § 59 (1996) ("Insofar as conduct amounts to, and is considered as, a representation,
it is dealt with in this chapter together with other matters constituting representations; but
insofar as conduct inconsistent with a right subsequently asserted is viewed as a form of
quasi estoppel, it is dealt with in the chapter on quasi estoppel . . . ."). Compare 31 id.
§§ 58-119, with 31 id. §§ 120-152. Quasi-estoppel precludes a party from asserting, to
another's disadvantage, a right inconsistent with a position previously taken. Lopez v.
Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000). It applies when it
would be unconscionable to allow a person to maintain a position inconsistent with one to
which he acquiesced, or from which he accepted a benefit. Id. Unlike equitable estoppel
by conduct, however, quasi-estoppel requires no showing of a false representation or of
detrimental reliance. Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 548 (Tex.
App.-Austin 1999, pet. denied).
8. Arguably, Maguire could invoke estoppel even if Section 23-102 prohibited it from
drilling. Houston Code of Ordinances Section 31-30, which Maguire offered as summary
judgment proof, requires a building official to issue a permit if (1) the permit application is
found to comply with Houston Code of Ordinances Chapter 31, and (2) the well is not
prohibited by Chapter 31. Houston, Tex., Code of Ordinances § 31-30 (1990). Arguably,
Section 31-30 creates a fact issue concerning the authority of city officials to issue a permit
for drilling in a location prohibited by Section 23-102. However, we believe Section 31-30
must be read in conjunction with the restrictions on drilling in Section 23-102. From this
we conclude the City did not authorize city officials to issue a drilling permit for a site where
drilling would be prohibited under Section 23-102.
9. Eunice A. Eichelberger, Annotation: Enforcement of Zoning Regulation as Affected
by Other Violations, 4 A.L.R. 4th 462 (1981).
10. The concept of discriminatory enforcement is based on the constitutional
guarantee of equal protection under the law. State v. Malone Serv. Co., 829 S.W.2d 763,
766 (Tex. 1992). The defense originated in the context of criminal prosecutions, but courts
in this state have held the governing principles also apply to civil proceedings involving
state agencies. Id.